# United States District Court

| SOUTHERN | DISTRICT OF | NEW YORK |
|---|---|---|

| | |
|---|---|
| SEA TRADE MARITIME CORPORATION and GEORGE PETERS, | **AMENDED SUMMONS IN A CIVIL CASE** |
| Plaintiffs | CASE NUMBER: 1:09-cv-00488-BSJ-HBP |
| v. | |
| STELIOS COUTSODONTIS, FRANCESA ELENI COUTSODONTIS, GENERAL MARITIME ENTERPRISES CORP., ATTIKA INTERNATIONAL NAVIGATION SA, and IASON SHIPPING LTD., | |
| Defendants. | |

TO: (Name and address of defendant)

SEE ATTACHED LIST

YOU ARE HEREBY SUMMONED and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, New York 10024

Attn: R. Mark Keenan
Greg Hansen

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

APR 0 3 2009

_____
CLERK

DATE _____

_Caurerie Lapadiey_

(BY) DEPUTY CLERK

NYDOCS1-917891.1

ANDERSON KILL & OLICK, P.C.
R. Mark Keenan (RK 7617)
Greg Hansen (GH 3516)
1251 Avenue of the Americas
New York, New York 10024
(212) 278-1000

Attorneys for Plaintiffs
Sea Trade Maritime Corporation
George Peters



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEA TRADE MARITIME CORPORATION
and GEORGE PETERS,

                         Plaintiffs,

          - against -

STELIOS COUTSODONTIS, FRANCESA
ELENI COUTSODONTIS, GENERAL
MARITIME ENTERPRISES
CORPORATION, ATTIKA
INTERNATIONAL NAVIGATION S.A. and
IASON SHIPPING LTD.

                         Defendants.

Civil Action No. 09 CIV 00488 (BSJ)

**AMENDED COMPLAINT**

Jury Trial Requested

## THE PARTIES

1.    Plaintiff Sea Trade Maritime Corporation ("Sea Trade") is a corporation, with a principal place of business at 750 Lexington Avenue, New York, New York 10022, and the previous owner of a bulk carrier M/V ATHENA ("the ATHENA").

2.    Plaintiff George Peters ("Peters") resides at 201 East 79th Street, New York, New York 10021.

NYDOCS1-910200 6

3.       Upon information and belief, the Defendant Stelios Coutsodontis ("Coutsodontis") resides at 9 Northway Street, Bronxville, New York 10708.

4.       Upon information and belief, the Defendant Francesca Eleni Coutsodontis ("Francesca") resides at 15 Dundee Road, Pinehurst, North Carolina 28374.

5.       Upon information and belief, Coutsodontis and Francesca are the true beneficial owners of at least three ocean cargo vessels:  1) the THEONIKI; 2) the THEODOROS P; and 3) the THEOFYLAKTOS.

6.       Upon information and belief, Defendant General Maritime Enterprises Corporation ("General Maritime") is a corporation registered in Liberia with a principal place of business in Piraeus, Greece, but which transacts business throughout the world, including within this state.  Upon information and belief, all of Coutsodontis and Francesca's vessels are managed by General Maritime.  Upon information and belief, Coutsodontis and Francesca have material ownership interests in General Maritime (although they have no official ownership interest in General Maritime) and the ships that General Maritime owns and manages, including but not limited to the THEOFYLAKTOS.

7.       Upon information and belief, the Defendant Attika International Navigation S.A ("Attika") is a corporation registered in Panama with a principal place of business in Piraeus, Greece, but which transacts business throughout the world, including within this state.  Upon information and belief, Coutsodontis, along with Francesca, has material ownership and management interests in Attika and the ships that Attika owns, including but not limited to the THEONIKI.

8.      Upon information and belief, the Defendant Iason Shipping Ltd. ("Iason") is a corporation registered in Malta with a principal place of business in Piraeus, Greece, but which transacts business throughout the world, including within this state. Upon information and belief, Coutsodontis, along with Francesca, has material ownership and management interests in Iason and the ships that Iason owns, including but not limited to the THEODOROS P.

9.      General Maritime, Attika and Iason (the "Shipping Defendants"), own and manage cargo vessels that operate throughout the world. Upon information and belief, the Shipping Defendants, and the ships that they own, are ultimately owned and controlled by Coutsodontis, along with Francesca.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1333 and 28 U.S.C. § 1367.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b), 28 U.S.C. § 1391(c) and 18 U.S.C. § 1965.

## NATURE OF THE ACTION

12.     This is an action related to a long standing blood feud between Coutsodontis and Mr. Peters over the management, control and ownership of Sea Trade, a maritime shipping company which owned, until recently, a vessel - the ATHENA.

13.     This feud is based upon Coutsodontis' antipathy for Mr. Peters, who is Sea Trade's attorney-in-fact and rightful manager. Coutsodontis' bitterness towards Mr. Peters, who is Coutsodontis' nephew, seems to have grown out of jealousy

over Mr. Peters' relationship with the original founder of Sea Trade, Elias Eliades, who was Coutsodontis' brother-in-law and Mr. Peters' uncle, and Athena Eliades, who was Coutsodontis' sister and Mr. Peters' aunt.

14.    Coutsodontis' hostility towards Mr. Peters has led him to undertake a series of actions designed to cause the financial ruin of Sea Trade, a company that Coutsodontis claims to own.

15.    Coutsodontis claims that he is the 50% owner of Sea Trade. Coutsodontis' claim is currently the subject of a litigation in Athens, Greece in which, upon information and belief, the Greek Court has entered a preliminary determination that Coutsodontis inherited 250 shares of Sea Trade. This Greek decision in not final and is subject to appeal.

16.    However, prior to the above-noted Greek decision, Coutsodontis had no interest in Sea Trade. Each and every act of interference by Coutsodontis alleged herein, which were all undertaken on behalf of all the Defendants, occurred before the Greek decision. But, that fact did not stop him from interfering with Sea Trade's operations.

17.    Indeed, based upon his claimed ownership of 50% of Sea Trade, Coutsodontis, on behalf of all the Defendants, repeatedly attempted to interfere with Sea Trade's operations and the operations of the ATHENA. In effect, Coutsodontis has used the shares he possessed as a weapon against Sea Trade – a company he claims to own.

18.    As discussed below, Coutsodontis' interference undertaken on behalf of all the Defendants includes, but is not limited to, causing numerous maritime arrests of the ATHENA.

19.    Coutsodontis' actions, which are designed to destroy Sea Trade's business reputation, are not the actions of a logical person who claims to own Sea Trade. Rather, these actions are motivated solely by a desire to destroy Mr. Peters and to take over sole ownership of Sea Trade and to benefit the other Defendants. .

20.    Coutsodontis' malicious and unlawful actions should result in Coutsodontis losing whatever interest he may have in Sea Trade.

21.    By this action, Sea Trade seeks equitable relief ordering Coutsodontis to forfeit whatever ownership interest he may have in Sea Trade. Based upon Coutsodontis' acts, he is not entitled to retain any ownership interest in Sea Trade because 1) his actions have caused irreparable damage to Sea Trade; 2) his actions have prevented Sea Trade from engaging in its intended purpose; and 3) he has not contributed to Sea Trade or Sea Trade's operations.

22.    Additionally, this action seeks compensatory relief to compensate Plaintiffs for the massive monetary damages that Coutsodontis actions, undertaken on behalf of all the Defendants, have caused to Plaintiffs, damages which drastically exceed the value of whatever interest Coutsodontis may have in Sea Trade.

23.    Also, this action seeks punitive damages against Coutsodontis and the other Defendants because all of Coutsodontis' actions were willful, wanton and motivated by ill-will and malice.

## FACTS

## I.   THE ORIGIN OF SEA TRADE

24.   At some point in the early 1990s, Mr. Eliades decided to make an entry into the shipping industry. The idea was that over time he would expand and grow the business.

25.   During the summer of 1992, Mr. Eliades sought assistance in entering the shipping market and asked Mr. Peters if he would assist. This was the origin of Coutsodontis' bitterness towards Mr. Peters, as Coutsodontis believed that he should have been assisting Mr. Eliades.

26.   Mr. Peters, an attorney who was licensed to practice law in New York, had a lively practice in New York which he abandoned in order to assist Mr. Eliades in the shipping venture.

27.   Mr. Eliades was adamantly opposed to Coutsodontis' involvement in the business because in previous dealings Coutsodontis had proven unreliable.

28.   Accordingly, Mr. Eliades instructed Mr. Peters that Coutsodontis was not, under any circumstances, to become involved in the prospective shipping venture. In fact, on several occasions, Mr. Eliades asked Mr. Peters to give him his word that Peters would see to it that this business was managed according to his wishes and that Defendant Coutsodontis would NEVER be involved. Mr. Peters has never been released from those instructions.

## II.   THE BIRTH OF SEA TRADE

29.   In or about July 1992, Sea Trade was formed and organized under the laws of the Republic of Liberia with the corporate purpose of owning a cargo vessel.

30.    Upon its formation, Sea Trade authorized the issuance of 500 "bearer" shares, with 475 shares transferred to Mr. Eliades and 25 shares transferred to Mr. Peters.

31.    Sea Trade's Articles of Incorporation provided that no shareholder would have "the power to sell, assign, transfer or otherwise dispose of" any shares of stock without the "unanimous written consent of all other shareholders of the Corporation." This provision, which is proper and binding, prevents any assignment – including gifts made by will – of shares of Sea Trade without the written consent of all other Sea Trade shareholders.

32.    Mr. Eliades expressed to Mr. Peters that the purpose of this restriction against alienation was to prevent Coutsodontis from becoming a part of their business venture.

33.    Mr. Eliades, as a gift to his wife, named Mrs. Eliades president of Sea Trade. From the very beginning, it was clear that Mrs. Eliades was president in name only and that she would not be involved in the management of Sea Trade.

34.    At the time, Mrs. Eliades was an elderly woman, who had absolutely no experience or training in business matters, let alone the shipping industry. Accordingly, on August 18, 1992, Mr. Peters received control of the day-to-day operations of Sea Trade through a broad power of attorney executed by written agreement.

35.    On or about December 10, 1992, Sea Trade purchased the ATHENA.

7

III.    DEFENDANT COUTSODONTIS' IMPROPER ACQUISITION OF SEA
        TRADE SHARES

36.    As discussed above, Sea Trade originally issued 500 shares, 475 to Mr. Eliades and 25 to Mr. Peters. Upon information and belief, Coutsodontis was unaware of the original distribution.

37.    On or about July 24, 1994, Elias cancelled the original 475 shares and redistributed them as follows: 150 shares to Anna Peters, 25 shares to Mr. Peters and Mr. Eliades maintained the remaining 300 shares. Upon information and belief, Coutsodontis was unaware of this redistribution.

38.    After this transfer, Mr. Peters held 50 shares, Anna Peters held 150 shares and Mr. Eliades held 300 shares of Sea Trade.

39.    Upon Mr. Eliades' death in September of 1996, Mrs. Eliades inherited his 300 shares of Sea Trade.

A.     The First "Will"

40.    Coutsodontis alleged that, in or around September 2000, Mrs. Eliades executed a hand-written agreement by which she distributed 250 of her 500 shares of Sea Trade to Coutsodontis. However, Mrs. Eliades did not own 500 shares of Sea Trade.

41.    This will violated Sea Trade's Articles of Incorporation because it attempted to transfer shares of Sea Trade without the written permission of Sea Trade's other shareholders.

42.    The circumstances surrounding the drafting and notarization of this will involves a mistaken understanding on the part of an ailing and confused Mrs. Eliades, and acts of deceit and underhanded dealings on the part of Coutsodontis.

43.     Upon information and belief, while on the island of Syros, Greece, both Mrs. Eliades and Anna Peters were escorted by Coutsodontis and some of his acquaintances to a notary where he commenced to have the alleged will drafted and notarized.

44.     Upon information and belief, during this meeting Mrs. Eliades was in a confused and fragile state of mind due to her health, old age and the intimidating scene that Coutsodontis and his affiliates presented.

45.     Upon information and belief, Coutsodontis took full advantage of Mrs. Eliades' confusion and inexperience and wrongfully coerced her into drafting and signing the will, which was improper, as Mrs. Eliades did not own, and never owned, 500 shares.

46.     However, Coutsodontis was unaware that Mrs. Eliades never owned all 500 shares of Sea Trade and thus, he drafted an incorrect will for Mrs. Eliades signature.

47.     Upon information and belief, Anna Peters tried to interfere in Coutsodontis' underhanded scheme by informing Mrs. Eliades that the document was inaccurate with regards to how many shares Mrs. Eliades actually owned at that time. Upon realizing the mistake, Mrs. Eliades asked the notary to return the document to her so that she might make this correction, but the notary refused to comply with her request and kept the document as is.

B.      The Second "Will"

9

48. Sometime thereafter, Coutsodontis realized the error of the first will and sought to remedy his oversight by concocting a story regarding the mistake and by drafting a subsequent hand-written will for Mrs. Eliades' signature.

49. Thus, Coutsodontis, again through coercion, convinced Mrs. Eliades to sign a second will which purportedly gave Coutsodontis 250 of Mrs. Eliades' 300 remaining shares.

50. This will violated Sea Trade's Articles of Incorporation because it attempted to transfer shares of Sea Trade without the written permission of Sea Trade's other shareholders.

51. On or about January 7, 2003, Mrs. Eliades passed away in Athens, Greece.

52. Both Coutsodontis and Anna Peters were present at the time.

53. Immediately following Mrs. Eliades' death, Coutsodontis and Anna Peters went to Mrs. Eliades' home and opened a safe which contained, among other things, Mrs. Eliades' 300 Sea Trade shares.

54. Claiming that Mrs. Eliades had given him 250 of those shares, Coutsodontis took 250 of the shares and gave the remaining 50 shares to Mrs. Peters.

C. Coutsodontis' New York Action

55. On February 9, 2005, Coutsodontis filed an action in New York seeking, among other things, recognition that he was 50% owner of Sea Trade by virtue of the shares he held and damages.

56. Originally, Coutsodontis claimed that he was 50% owner of Sea Trade by virtue of an *inter vivos* gift of the shares from Mrs. Eliades. In support of this

theory, Coutsodontis submitted the two hand-written wills and concocted a tale that Mrs. Eliades somehow made a symbolic delivery of the shares to Coutsodontis before she died.

57.      On February 6, 2006, Justice Cahn of the Supreme Court of New York, New York County, dismissed Coutsodontis' action, determining that the claim of an *inter vivos* gift was flatly contradicted by the documentary evidence – e.g. the two hand-written wills.

58.      Although Justice Cahn did not determine the validity of the wills, instead determining that the validity of the wills was a matter for the Greek probate courts, Justice Cahn did hold that Coutsodontis' possession of the Sea Trade shares did not establish that he had any interest in Sea Trade.

59.      Nevertheless, Coutsodontis has consistently used his **possession** of the shares, without any adjudication as to whether Coutsodontis legally possessed those shares, as a means to interfere with and cause damage to Sea Trade.

60.      It is this claimed ownership interest that Coutsodontis has used as a weapon to interfere with, and damage, Sea Trade.

61.      Upon information and belief, a Greek court recently issued a preliminary decision determining that Coutsodontis did inherit 250 shares of Sea Trade. This decision is not final and is subject to an appeal.

62.      In any event, **all** of Coutsodontis' acts of interference occurred **before** any determination that Coutsodontis inherited shares of Sea Trade.

IV.      COUTSODONTIS' INTERFERENCE WITH SEA TRADE

   A.      Coutsodontis' Unlawful Maritime Arrests

1.    Spanish Arrest

63.    On or about July 10, 2008, Coutsodontis, on behalf of all the Defendants, brought an ex parte petition for the arrest of the ATHENA in the commercial court of Tarragona, Spain.

64.    In the petition for arrest, Coutsodontis' fraudulently claimed that he owned 50% of the ATHENA. This statement was, and is, knowingly false because Coutsodontis claims ownership interest in Sea Trade, not the ATHENA.

65.    However, this statement was relied upon by the Spanish Court, which issued an arrest order confining the ATHENA to port.

66.    On or about August 4, 2008, the Spanish Court lifted the arrest and permitted the ATHENA to once again engage in trade. In removing the arrest, the Spanish Court recognized that Coutsodontis' claim was for ownership of Sea Trade and not the ATHENA, and that Coutsodontis' claim was insufficient to support an arrest of the vessel.

67.    Moreover, the Spanish Court determined that the arrest was wrongful and that Sea Trade was entitled to damages against Coutsodontis.

68.    Coutsodontis appealed the Spanish Court's decision. Coutsodontis' appeal was denied and the Spanish Court's decision was affirmed on or about February 26, 2009.

2.    Louisiana Arrest

69.    On or about August 27, 2008, Coutsodontis, for the benefit of all the Defendants, filed a complaint in the United States District Court for the Eastern District of Louisiana seeking to place the ATHENA under arrest.

70.    As in Spain, Coutsodontis' basis for arresting the vessel was his purported 50% ownership of Sea Trade – not the ATHENA.  Coutsodontis alleged, however, that he had a 50% ownership interest in the ATHENA.

71.    Like the Spanish Court, the Louisiana Court relied upon this fraudulent statement and issued an arrest warrant.

72.    On September 12, 2008, the Louisiana District Court lifted the arrest. In lifting the arrest, the Louisiana District Court determined, just like the Spanish Court, that Coutsodontis did not have a valid maritime claim against the ATHENA.

73.    At the time of the arrests, Coutsodontis knew, or should have known, that he had no claim against the ATHENA and, therefore, the arrests of the vessel were wrongful.

74.    This is particularly true in regard to the Louisiana Arrest, which was based on the exact same claims that had been previously rejected in Spain.

75.    In addition to the above-stated fraudulent claim of ownership of the ATHENA, Coutsodontis also made the fraudulent statement that he had been advised by the ATHENA's master that Sea Trade was in the process of selling the vessel.

76.    This ships master, however, has submitted a sworn statement that he never made any such representation and, consequently, Coutsodontis' statement was a lie.

77.   Accordingly, Coutsodontis' statements were incorrect and fraudulently made in order to support the basis for the arrests.

78.   Upon information and belief, Coutsodontis' above noted arrests were motivated by malice and had two goals: 1) to prevent Sea Trade from generating cash flow and placing Sea Trade in danger of becoming insolvent, thereby limiting its ability to continue operations; and 2) to destroy Sea Trade's business reputation, thereby limiting its ability to engage in future operations.

79.   As a direct and proximate result of Coutsodontis' unlawful arrests, Plaintiffs' business reputation has been permanently and irrecoverably damaged. The above-referenced damage to Plaintiffs' reputation cannot be reasonable or accurately determined and equitable relief requiring Coutsodontis to forfeit his claimed interest in Sea Trade is appropriate.

80.   As a direct and proximate result of Coutsodontis' unlawful arrests, In addition to irreparable damages, Plaintiffs have been injured in an amount to be proven at trial but believed to be in excess of $5 million.

81.   Because Coutsodontis' acts were willful, wanton and motivated by malice, Plaintiffs' are entitled to punitive damages.

B.   Anti-Sale Injunction

82.   After the Louisiana Court vacated Coutsodontis' improper arrest, on or about September 13, 2008, Sea Trade acquired a time charter for a voyage from Louisiana to Egypt.

83.   On or about October 15, 2008, that time charter was completed and the ATHENA was delivered to Sea Trade.

84.    Following re-delivery, on or about October 20, 2008, Sea Trade was unable to obtain another charter. Consequently, the ATHENA called in Gibraltar without a charter.

85.    While in Gibraltar, and without a charter, Sea Trade incurred extensive losses and expenses.

86.    The only option remaining for Sea Trade to avoid further losses and remain a viable corporation was to sell the vessel. In order for Sea Trade to avoid complete devastation, Sea Trade had to sell the vessel, and sell it now.

87.    On or about January 6, 2009, Sea Trade negotiated an agreement to sell the ATHENA for two-million six hundred twenty five thousand United States dollars ($2,625,000.00). As security for the sale, the purchaser provided twenty (20%) percent of the purchase price as a down payment. The contractually agreed upon date of delivery was January 20, 2009.

88.    As some point, Coutsodontis learned of the impending sale.

89.    On or about January 14, 2009, Coutsodontis applied to the Greek Court for an injunction preventing the sale. Upon information and belief, Coutsodontis attempted to prevent Sea Trade from selling its vessel because Coutsodontis wanted to add the vessel to his maritime enterprise. Thus, the injunction was sought for the benefit of all the Defendants.

90.    The injunction was granted. However, Coutsodontis was not required to post an undertaking in order to receive the injunction.

91.    Upon information and belief, Coutsodontis, in the Greek action seeking an injunction, claimed an interest in the ATHENA, which is false, because he

PAGE   04/08                                                    1914395137S    14:02   05/07/2008

previously only claimed an interest in Sea Trade, the corporation. Coutsodontis also claimed that he would be irreparably injured by the sale.

92.     It was impossible for Coutsodontis to suffer any irreparable injury from the sale of the ATHENA because, even if he is ultimately determined to have some interest in the proceeds of the sale, he can be compensated monetarily.

93.     Coutsodontis not only improperly obtained an injunction, he did so without posting a bond or undertaking. The injunction prohibited Sea Trade from selling the ATHENA while furthering Coutsodontis' own personal vendetta against his nephew.

94.     Coutsodontis, a New York resident, sought the injunction in Greece because he knew that by not being required to post an undertaking, as required by New York law, he would cause further injury to both his nephew, plaintiff George Peters, and Sea Trade.

95.     The injunction prevented Sea Trade from completing the sale as called for in the original Memorandum of Understanding, which gave the buyer of the vessel the right to cancel the contract.

96.     In fact, the buyer did cancel the original sale agreement, but re-negotiated the deal at a new price which was $250,000 lower than the original agreed upon price.

97.     In the absence of Coutsodontis' injunction, the sale would have been completed as originally scheduled and Sea Trade would not have been forced to renegotiate the contract.

98.   On January 23, 2009, Plaintiffs were forced to initiate an action in New York Supreme Court and brought a motion by order to show cause seeking an order preventing Coutsodontis from interfering with the sale of the ATHENA.

99.   On January 27, 2009, the parties entered into an agreement to allow the sale of the vessel.

100.   Based upon that agreement, Sea Trade was able to finalize the sale of the ATHENA. That transaction closed on February 11, 2009 and Sea Trade received $2,263,437.50 for the sale of the ATHENA.

101.   In addition to the reduction in the purchase price, Coutsodontis' injunction caused the sale of the ATHENA to be delayed by approximately 22 days.

102.   Sea Trade incurred expenses for the ATHENA at a rate of approximately $10,000 per day – expenses that Sea Trade would not have incurred but for Coutsodontis' injunction.

103.   Additionally, Coutsodontis' injunction was motivated by malice with the intent of: 1) damaging Sea Trade's business reputation; 2) preventing Sea Trade from selling the vessel, thereby forcing Sea Trade into bankruptcy; and 3) monetarily benefiting the other Defendants.

104.   As a direct and proximate result of Coutsodontis' interference with the sale, Plaintiffs' business reputation has been permanently and irrecoverably damaged. The above-referenced damage to Plaintiffs' reputation cannot be reasonable or accurately determined and equitable relief requiring Coutsodontis to forfeit his claimed interest in Sea Trade is appropriate.

105.   As a direct and proximate result of Coutsodontis' actions, undertaken on behalf of all the Defendants, in addition to irreparable damages, Plaintiffs have been injured in an amount to be proven at trial but believed to be in excess of $1 million.

106.   Because Coutsodontis' acts were willful, wanton and motivated by malice, Plaintiffs' are entitled to punitive damages.

C.   Interference with Sea Trade's Contractual Relationships

107.   In or about May, 1997, Sea Trade suffered a casualty to the ATHENA when the vessel was bombed by terrorists while in Sri Lanka.

108.   Accordingly, Sea Trade brought a claim under its "war risk" insurance, which was sold by Hellenic War Risk Mutual Association.

109.   Hellenic denied Sea Trade's claim and a dispute subsequently arose.

110.   Upon information and belief, Coutsodontis, in order to injure Plaintiffs and benefit all the Defendants, intentionally and improperly interjected himself into the dispute between Sea Trade and Hellenic in an attempt to induce Hellenic to reject Sea Trade's claim and therefore breach its contract with Sea Trade.

111.   Coutsodontis' illegal activities include, but are not limited to: (1) providing Hellenic with incorrect and damaging information regarding both Sea Trade and Peters; (2) defaming Peters as a fraudster and forger; and (3) informing Hellenic that Coutsodontis, and not Peters, was the true owner of Sea Trade.

112.   The actions were intended to induce Hellenic to reject Sea Trade's claim and did, in fact, result in Hellenic materially rejecting Sea Trade's claim – resulting

in lost recovery of approximately $3.6 million. Additionally, Sea Trade was forced to incur extensive legal fees in pursuing various actions against Hellenic, which were made more difficult and complex by Coutsodontis' interference with the relationship.

113.   As a direct and proximate result of Coutsodontis' interference with Sea Trade's insurance recovery, undertaken on behalf of all the Defendants, in addition to irreparable damages, Plaintiffs have been injured in an amount to be proven at trial but believed to be in excess of $5 million.

114.   Because Coutsodontis' acts were willful, wanton and motivated by malice, Plaintiffs' are entitled to punitive damages.

D.   Defamation

115.   As discussed above, Coutsodontis has defamed Peters both individually and in his profession.

116.   Coutsodontis filed an action and made certain defamatory statements about Peters, including accusing him of committing the crime of forging the power of attorney.

117.   Coutsodontis' statements were untrue and were known by Coutsodontis to be untrue at the time he made them.

118.   Coutsodontis then defamed Peters a second time by distributing the defamatory statements to parties outside the action, including Hellenic and other members of the shipping industry.

119.   This second defamation was intended to destroy Peters' ability to operate in the shipping industry which, in turn, would make it impossible for Sea Trade to continue operations and would benefit the other Defendants.

120.    As a direct and proximate result of Coutsodontis' defamation, which was undertaken on behalf of all Defendants, Plaintiffs' business reputation has been permanently and irrecoverably damaged. The above-referenced damage to Plaintiffs' reputation cannot be reasonably or accurately determined and equitable relief requiring Coutsodontis to forfeit his claimed interest in Sea Trade is appropriate.

121.    Because Coutsodontis' acts were willful, wanton and motivated by malice, Plaintiffs' are entitled to punitive damages.

E.    Filing Vexatious and Harassing Litigation

122.    On or about October 9, 2008, Coutsodontis, on behalf of all the Defendants, brought an action in the Piraeus Court seeking a determination that Sea Trade was obligated to recognize him as a 50% owner (despite the fact that the Athens Court had not yet ruled on the validity of Coutsodontis alleged inheritance).

123.    It was represented that this action was merely a procedural filing, required in order to seek the above-mentioned anti-sale injunction. However, it has become clear that this representation was false, that the action is totally independent of the injunction, and that it may continue despite the fact that the injunction has been dismissed.

124.    Coutsodontis knew or should have known that the Piraeus Court lacked any basis for exercising personal jurisdiction over Sea Trade.

125.    Nevertheless, Coutsodontis based his claim for jurisdiction on the fact that Sea Trade had entered into a ship management agreement with a Greek company, Byzantine Maritime Corporation. However, pursuant to that ship management agreement – which, as of the sale of the ATHENA, was terminated – the

PAGE 01/07                                        1914395137S        14:07    05/07/2008

vast majority of Sea Trade's operations were undertaken by Colonial Navigation Company, which is located in New York.

126.   Moreover, the Piraeus action is vexatious and simply duplicative of Coutsodontis' action in the Athens court (where he seeks a recognition that he properly inherited shares of Sea Trade).

127.   Coutsodontis' filing in the Piraeus Court was an improper attempt to subject Sea Trade to harassing litigation in an unfavorable and inconvenient forum. Upon Information and belief, Coutsodontis brought this additional action to harass Sea Trade and cause Sea Trade to incur extensive and unnecessary litigation expenses.

128.   Because Coutsodontis' acts were willful, wanton and motivated by malice, Plaintiffs also are entitled to punitive damages.

## AS AND FOR A FIRST CAUSE OF ACTION

129.   Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 128, as if fully set forth herein.

130.   Coutsodontis claims to be a 50% owner of Sea Trade.

131.   Based upon this claimed ownership, Coutsodontis, on behalf of the other Defendants, has been able to cause damage to, and interfere with, Sea Trade based upon his claimed ownership.

132.   Coutsodontis' wrongful maritime arrests, which were based upon fraudulent statements, resulted in Sea Trade losing charters because the ATHENA could not fulfill its commitments while arrested.

NYDOCS1-910200.5

21

133.   The fact the ATHENA has been wrongfully arrested is well-known in the shipping industry, especially among charterers. This has irreparably harmed Sea Trade's business reputation.

134.   Coutsodontis' improper injunction was motivated by malice with the intent of further eroding Sea Trade's business reputation as a viable company with which to contract.

135.   Coutsodontis' intentional and malicious acts, discussed above, have caused extensive damages to Sea Trade. In addition to huge monetary damages, Sea Trade's business reputation has been irreparably damaged.

136.   The damage to Sea Trade's business reputation, caused by the unlawful arrests and the continual threat of future arrest to the ATHENA, had a chilling effect on the market for the vessel.

137.   Charterers were unwilling to risk chartering the ATHENA because they knew that Coutsodontis intended to wrongfully arrest the ATHENA. The lack of charters for the ATHENA threatened Sea Trade's solvency and ultimately led to the sale of the ATHENA.

138.   It is impossible to quantify the amount of damage Coutsodontis' actions have caused to Sea Trade and, therefore, Sea Trade has no sufficient remedy at law.

139.   Coutsodontis' wrongful acts, undertaken on behalf of all Defendants, and his various breaches of duties to Sea Trade and its other shareholders were all intended to destroy Sea Trade. In this connection, Coutsodontis undertook the strategy of "if I can't have it, no one will."

140. Coutsodontis' acts have caused irreparable injury to Sea Trade and its other shareholders. The only manner to make Plaintiffs whole is to expel Coutsodontis from the company and preclude him from exercising any ownership interest in Sea Trade.

141. Accordingly, Sea Trade seeks equitable relief in the form of eliminating any ownership interest Coutsodontis may have in Sea Trade or requiring Coutsodontis to forfeit any ownership interest he has or claims to have in Sea Trade.

142. In addition to irreparable injury, Coutsodontis' actions, undertaken on behalf of all the Defendants, have caused extensive monetary damages to Plaintiffs, for which Plaintiffs are entitled to compensatory damages in an amount to be proven at trial but believed to be in excess of $15 million.

143. In addition, because Coutsodontis' acts were willful, wanton and motivated by malice, Plaintiffs also are entitled to punitive damages in excess of $15 million.

## AS AND FOR A SECOND CAUSE OF ACTION

144. Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 143, as if fully set forth herein.

145. Coutsodontis claims to be a 50% owner of a close corporation, which operates similar to a partnership.

146. Coutsodontis' above-noted actions were intended to, and resulted in, Sea Trade being precluded from engaging in its corporate purpose – marine cargo shipping.

147.   Coutsodontis used his claimed membership in the partnership to prevent the partnership from engaging in its purpose and thus should be expelled from the partnership.

148.   In order to expel Coutsodontis, he must be forced to forfeit the shares which he holds.

### AS AND FOR A THIRD CAUSE OF ACTION

149.   Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 148, as if fully set forth herein.

150.   Coutsodontis claims to be a 50% owner of Sea Trade.

151.   As a 50% owner, Coutsodontis would owe Sea Trade – and its other shareholders – a fiduciary duty to act in Sea Trade's best interests and to prevent self dealing.

152.   Coutsodontis has repeatedly breached the fiduciary duty he would owe Sea Trade by, among other things, causing damage to Sea Trade and operating the Defendants' Shipping Interests in competition with Sea Trade.

153.   These breaches of his fiduciary duty have resulted in extensive monetary damages to Sea Trade, as well as irreparable damage to Sea Trade's business reputation.

154.   These damages dwarf the value of any ownership interest claimed by Coutsodontis.

155.   Accordingly, as a result of Coutsodontis' illegal actions and in order to prevent further illegal actions, any ownership interest that Coutsodontis claims to possess in Sea Trade should be eliminated.

156.   Further, Coutsodontis should be forced to forfeit whatever shares of Sea Trade he possesses or claims to possess.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant:

(a)   On the First Claim for Relief, for an order requiring Coutsodontis to forfeit any ownership interest he claims to have in Sea Trade.

(b)   On the First Claim for Relief, for compensatory damages in an amount to be proven at trial.

(c)   On the First Claim for Relief, for punitive damages in an amount to be proven at trial.

(d)   On the Second Claim for Relief, for an order requiring Coutsodontis to forfeit any ownership interest he claims to have in Sea Trade.

(e)   On the Third Claim for Relief, for an order requiring Coutsodontis to forfeit any ownership interest he claims to have in Sea Trade.

(f)    On all Claims for Relief, any and all such additional relief as

the Court deems just and appropriate.

April 3, 2009

By: _____

R. Mark Keenan (RK 7617)
Greg Hansen (GH 3516)

Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212-278-1000

Attorneys for Plaintiffs
Sea Trade Maritime Corporation
George Peters

NYDOCS1-910200.8         26