UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| SEA TRADE MARITIME CORPORATION and GEORGE PETERS,<br><br>                          Plaintiffs,<br><br>  - against -<br><br>STELIOS COUTSODONTIS, FRANCESCA ELENI COUTSODONTIS, GENERAL MARITIME ENTERPRISES CORPORATION, ATTIKA INTERNATIONAL NAVIGATION SA, IASON SHIPPING LTD., PINTO SHIPPING LTD., AND KARTERIA SHIPPING LTD.,<br><br>                          Defendants. |

Civil Action No. 09-CIV 00488 (BSJ)

**AFFIDAVIT OF GEORGE C. PETERS**

STATE OF NEW YORK  )
                          : ss.:
COUNTY OF NEW YORK )

        **GEORGE C. PETERS,** being duly sworn, deposes and says:

        1.    I am fully familiar with the facts set forth herein and submit this affidavit in support of plaintiffs' motion for summary judgment. I am a shareholder of plaintiff Sea Trade Maritime Corporation and have acted as attorney-in-fact for the company during its entire existence.

        2.    The purpose of this affidavit is to set forth the factual and family undercurrent to this case and the reason for the consent restrictions in our close corporation, Sea Trade.

### Sea Trade's Inception

        3.    Sea Trade was founded by my uncle Elias Eliades in 1992. Elias was a very successful industrialist who owned factories for processing soy beans and

producing soy products in Greece but wanted to expand into the shipping business as a ship owner. Elias and I had been close for many years. Elias had no children and had always treated me as a son. We had mutual interest in the business world, and as Elias was an extremely successful and well-respected businessman he would often recount to me his experiences and we frequently discussed business opportunities and ventures. In early 1992, he asked me if I would be able to facilitate an entry into the shipping markets through the direct purchase and management of a cargo vessel for him. At the time, I was beginning a law practice in New York. Elias indicated to me that with a successful entry into shipping, he intended to diversify his holdings and grow the business and that he would like me to stay on and manage his shipping interests.

4. During the summer of 1992, I had numerous discussions with Elias regarding the new company. Out of the many points he discussed with me, one particular point was highlighted. As the proposed company was to be kept within the family with only a few shareholders, he told me that he had great antipathy to his wife's brother, Steve Coutsodontis, as a result of certain experiences Elias had as outlined later, and thus Steve was never to be involved with Sea Trade.

5. Later in the summer of 1992, I traveled to Greece to meet with Elias. At that time in discussing the new venture he said in the presence of his wife, noting his past experiences, that "I am putting my trust in George" and that she was not to think under any circumstances of trying to involve anyone else (meaning Steve) in the company, to which she readily agreed. This was repeated several times during my stay in Greece.

6.     Elias also told me that he would like to make his wife "president" of the company and also to name the ship we purchased after her in order to flatter her. We did and the ship's name was the "ATHENA". However, he stated it was understood that she would naturally take no part in the company as she had never worked a day in her life, had no experience in business, nor did she wish to. I was made sole attorney-in-fact, a common description in shipping and left in full charge of Sea Trade's operations. All of this created a great amount of antipathy directed at me from Steve who felt that I, who was much younger, was being favored over him.

### Elias' Prior "Experiences" with Coutsodontis

7.     Elias explained to me that in the 1960's Steve had been employed by Trans-Ocean Steamship Co. in New York, and that Steve had persuaded him to invest money in the shipping business, in connection with his employment with Trans-Ocean. Elias would periodically ask Steve for reports regarding his investment but as he related to me, no reports were ever provided. Elias was irate that his requests for reports would be continuously ignored and the situation deteriorated into a big fiasco with Steve's employment at Trans-Ocean being terminated. Elias explained to me that he never received any part of his investment back from Coutsodontis. The animosity ran both ways as Elias' insistence on receiving some kind of reporting on his investment, and Steve's failure to respond, had led to the termination of Steve's employment.

8.     Subsequently, after numerous pleas from his wife Athena, Elias explained to me that he had again invested money with Coutsodontis in the Captain Leonidas, a ship owned and managed by Steve. The ship went aground in Chile in

what Elias said was reported as an attempted insurance fraud, and that someone involved with the company subsequently went to prison. Again, Elias never received any part of his investment back. Elias expressed his outrage and stated that he felt personally defrauded and that other industry "insiders" had warned him that Steve was defrauding him.

9. Some years later Steve was employed by the Tsavaris Shipping Co. in New York. This situation ended in a huge lawsuit for fraud with Steve being sued by his employer for various fraudulent acts in state court in New York. See affidavits of John Tsavaris dated August 12. 1980 and Louis J. Tsavaris dated August 12, 1980 and November 5, 1980 (collectively attached as Exhibit A hereto). These affidavits speak for themselves and contain numerous and very serious allegations of fraud.

10. Elias repeatedly stated that he did not want Steve involved with Sea Trade and Steve knew it. Steve was not even welcome in Elias' home after the incidents cited above. So great was Elias' antipathy to Steve that even years later, the mere mention of Steve's name would provoke an explosive reaction from Elias. Elias would shout that Steve was a fraudster had wronged him after Elias had trusted him with investments and given him a chance, not once but several times. Further Elias stated that I was not to even contemplate in any way involving Steve with Sea Trade, not even peripherally, in any way shape or form. Given what I was told, the multiple allegations of fraud from people outside of the family (see Exhibit A attached hereto) and the antipathy between Steve and myself, I fully agreed.

### Sea Trade Consent Requirement

11. I gave Elias my word that I would do this and that Steve would not be involved in Sea Trade. Thus it was a mutual agreement that Steve would be kept out of any involvement with the new company. If we had not agreed on this neither Elias nor I would have ever risked our initial seed capital or our time, effort and reputation in Sea Trade. Elias and I relied on the fact that the restriction on transfer requiring consent of <u>all</u> shareholders, which we inserted in Sea Trade's Articles and stock certificates, would be an absolute bar to Steve's involvement. We relied on that bar. Again, it was for this reason, to keep Steve out (and to limit further shareholder expansion to those we believed we could work with), that Elias and I formed Sea Trade with restrictive Articles of Incorporation in the first place. I would certainly never have left the practice of law nor would I have risked my own savings to manage Sea Trade if I even remotely imagined that Steve could be involved.

### Sea Trade's Structure and the Consent Requirement

12. We proceeded to discuss the structure of the new company. The corporate law of different jurisdictions was examined. Elias wanted and I had recommended a bearer share company with only two or three shareholders, which is commonly used in the shipping industry and Liberian law as the governing law and situs of our incorporation (which again is common in the shipping industry). That would afford management maximum flexibility in business but we also wanted appropriate provisions restricting the transfer of shares to Elias, his wife and me by a written condition that <u>all share transfers required the prior approval or consent of the existing shareholders</u>.

13. We decided to incorporate as a Liberian company because Liberia offered a clear corporate structure commonly used in shipping with a clear <u>consent</u> restriction provision which we liked because it would allow us to "hold this company tightly" – unless we all approve otherwise between the three of us. For emphasis, we decided to put the restriction in the Articles of Incorporation rather than in the by-laws or a separate agreement. We also had the consent restriction typed into the bearer shares.

14. The original distribution of shares on incorporation of the business was 475 shares to Elias and 25 to me. I had written to him on incorporation giving him my consent if he wished to transfer shares to his wife. Again, when he made a gift of further shares to me and my mother in 1994, I had written to him thanking him and stating that in the interest of corporate governance he had our consent it he should at any time wish to transfer shares to his wife. In addition, our ownership of shares would always be sufficient to keep Steve out of Sea Trade as there would never be unanimity of consent to Steve becoming a shareholder. In the event of Elias' incapacity or of my incapacity either of us could withhold consent and thus bar Steve (or anyone else) from the company. The only way we could have been more emphatic about barring Steve would have been for us to have the Articles mention Steve by name. We did not want to do that in front of Elias' wife. The consent restriction in the Articles and the bearer certificates were our way of safeguarding our control and that no one would be able to "intrude" into Sea Trade against our will i.e., without our unanimous consent, particularly Steve.

15. In 1994 Elias told me that he wished to increase my equity participation by giving me 25 additional shares and that he was making a gift to my mother of 150 shares. This transfer is memorialized in a signed consent of all the shareholders including Elias, Athena and myself. In other words, all of the shareholders of Sea Trade knew they were bound by the consent requirements – and acted on it.

### Coutsodontis's Intrusions

16. While Elias was alive there was nothing Steve could do as a practical matter to intrude with the company. However, as soon as Elias' health began to go downhill in the mid 1990's, Steve's campaign intensified. Steve began to call me at the office and threaten me that he " was giving me 48 hours " to turn over to him Sea Trade's management agreement, minute book, stock ledger and other proprietary company documents. At other times Steve would demand that he be given all of Sea Trade's insurance policies and charter agreements. Steve was allegedly making this demand on behalf of my aunt. I learned from my aunt that Steve's intention was to bring Sea Trade's ship, the ATHENA, to General Maritime for management. In fact, the principals of General Maritime (Steve's cousins), together with Steve were pressuring her to try to arrange this. His idea was that when he succeeded in ousting me from my position with Sea Trade, he would enter into a management agreement with General Maritime with whom he is a joint venturist. Suffice it to say that the attacks on the company and on me personally continued unabated every year thereafter. At the same time I had several discussions with my aunt regarding Sea Trade for the purpose of reminding her that not only did Elias and I have an agreement regarding Sea Trade's

shares and the problem of Steve, but that she had also agreed as well. Each time she reiterated that she would respect her agreement.

17. Nevertheless, Steve's efforts to oust me from Sea Trade continued. It had been our practice during the early years of Sea Trade's operation to produce audited reports by Arthur Andersen for the bank which held the mortgage on the ship. In order to lay rest Steve's unfounded attacks that he would be better managing Sea Trade than I, I mentioned to my aunt that Elias, her husband had received audited reports by Arthur Andersen and that he was well satisfied with the progress of the company. Steve then told her that "those things can be done up any way you want". On subsequent occasions, I would mention the audited reports and Steve would tell her "those are cooked up by George and Trans-Ocean" and "Arthur Andersen just writes whatever George and Theo want". This is how absurd the antipathy was getting.

18. Steve also persuaded his sister that certain profits made by Sea Trade should be paid out to her and not left in the company because according to Steve if she did not take them out of the company everything would be lost and she would never see a penny. I tried to convince her that it would be wiser to leave some capital in the company for operations and in case of emergencies. She was adamant however that this was the only course of action and that Steve could only be right. I sent her over $5 million in accumulated profits which were in the corporate treasury at that time. This payment served to bleed the company of operating capital so that if we were to run into trouble and have a sudden need for cash, or if the market were to drop suddenly, as can happen in shipping, we would have trouble continuing operations.

19. In 1997 when the Athena was damaged in a terrorist bombing in Sri Lanka, Sea Trade was hit with major expenses for repairs and salvage. This situation was exacerbated by one of our insurance underwriters claiming they were entitled to pay only 50% of the claim. Steve immediately persuaded his sister that she should not put "one more penny" into the company. I had no option but to personally loan over $900,000 to Sea Trade. Had I not done so we would not be here today as there would be no company for Steve to attack.

20. While Steve's other schemes and attacks on Sea Trade have been injurious as set forth in the complaint in this action, it is his latest and unfounded claim to share ownership (allegedly through inheritance) that has allowed Steve to do damage to the company that makes the previous injuries pale by comparison. The two false arrests of Sea Trade's only ship, the vexatious litigation and the sale interference have not only deprived the company of substantial earnings and reserves, but also damaged its business reputation and deprived it of significant opportunities to expand by taking advantage of market conditions to purchase additional ships, in short to pursue the growth any company envisions. Steven has done incalculable damage to this company. The damages done by the false arrests is far beyond the dollar amounts in expenses and lost revenues caused by the detentions themselves (which are in the millions of dollars). In the shipping business profits are made in two ways -- by the daily earnings of the ship's employment, and by the selling the ship during a favorable market where the ship's sale value may have appreciated by several hundred percent. Strategically a ship-owning company will endeavor to sell it's vessel when the market is strong and then replace it with a newer one as well as acquire one or more additional vessels when

the market moves again into a down cycle. Steve's false arrests have ensured that favorable opportunities were foreclosed to Sea Trade. Arrests are not small matters in the shipping industry; they are frequently published in industry journals and become widely known. During the time of the arrests the market had moved from a favorable level then declined dramatically. It would have been a natural business strategy to have sold Sea Trade's ship the summer of 2008 and purchase two or more quality ships. Sea Trade was prevented from maximizing the value of its only asset as the ship could not be freely sold during this time. As set forth in the affidavit of Jeff Hill filed in support of this motion, charterers and purchasers become reluctant when a vessel is arrested – particularly if arrested several times. Additionally, being depleted of millions of dollars by the expenses and losses of the arrest, the lost charter opportunities and the vexatious litigation, Sea Trade was deprived of other opportunities, apart from the sale of the ATHENA, to acquire additional ships at bargain prices when the market fell. Thus, Sea Trade was foreclosed from the traditional and usual strategies used in shipping to grow and maximize shareholder value.

21. During the spring and summer of 2008 as the favorable shipping freight market continued its climb and ship values rose accordingly, it became apparent that a sale of the ATHENA should be a consideration in order to maximize shareholder value. It would have been a natural business strategy to have sold Sea Trade's ship during this peak and purchase two or more quality ships during the trough in the market which followed thereafter. A sale would have to be considered based on the high market alone but the additional consideration of the age and survey position of the "Athena" made it more compelling.

22. The ATHENA was due for special survey in eight months. Special surveys can entail expenditures of several millions of dollars depending on the amount of steel work necessary and considerable time in the shipyard. Passing special survey is mandatory if a ship is to maintain its classification in good standing, be properly insured, and allowed to trade. Since expenditures for special survey can run into the millions of dollars depending on the amount of steel work required, it is always a consideration, particularly with older ships such as the Athena whether a ship owner should sell prior to the survey or risk investing several million to pass special survey if the projected working life of the ship does not suggest that such investment will be recouped.

23. Ships such as the ATHENA are generally held to have a working life of approximately 25 years. At that time, the ATHENA was 29 years old. Older ships above 25 years old such as the ATHENA begin to command lower rates in the market, are more difficult to insure, and charterers have requirements that often preclude them from fixing business with older ships. So the older a ship gets the more limited its charter market becomes. Therefore in a good market where the sale values are high, a ship manager has an additional incentive to sell an asset whose high value is of limited duration.

24. In the summer of 2008 the ATHENA was already 29 years old. A further reason to consider sale was that as of January 1st the ATHENA would be classified as a 30 year old ship, a designation that, would lessen its value to potential buyers. Accordingly in the late spring and early summer of 2008 I began to have several conversations with our maritime counsel regarding the difficulties and issues a

sale would present because of the vexatious litigation and specious claims against the ATHENA and Sea Trade. My hope would have been to have the ATHENA offered for sale by June - July and hopefully enter into a memorandum of agreement by the end of July or early August at the latest with delivery to take place within a reasonable time.

25. Unfortunately, the two false arrests and specious claims against the ATHENA and Sea Trade precluded a sale during what was a favorable freight market when we would have been able to realize a favorable price for the ship.

26. It is astonishing that Steve, a multi-millionaire, owner of race horses, numerous businesses managed together with his daughter, including multiple properties and ships managed by General Maritime; who regularly hires lawyers all over the world to attack Sea Trade, has been willing to pursue this vendetta against me, my mother, who is also his sister, and the company Elias founded, because Elias decided to exclude Steve from the venture. Apparently no expense is too great and no effort too unreasonable or off limits in this long, long fit of pique, to bring down the company Elias founded, all because his brother-in-law decided he did not want to do business with him.

_____
George C. Peters

Sworn to before me this
14th day of April, 2011.

_____
Notary Public

PATRICIA E. WARD
Notary Public, State of New York
No. 01WA4690492
Qualified in Westchester County
Commission Expires July 31, 2013