UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
                          :

SEA TRADE MARITIME CORPORATION   :
and GEORGE PETERS,                 :
                Plaintiffs,   :
                          :
          v.              :

STELIOS COUTSODONTIS, FRANCESA   :
ELENI COUTSODONTIS, GENERAL      :
MARITIME ENTERPRISES CORPORATION, :
ATTIKA INTERNATIONAL          :
NAVIGATION S.A. and IASON SHIPPING :
LTD.                      :
               Defendants,   :
                          :
----------------------------------x

09 Civ. 488(BSJ)(HBP)
**Memorandum and Order**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/16/12

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

## INTRODUCTION

Pursuant to Rules 12(b)(1), (2), and (6) of the Federal Rules of Civil Procedure, General Maritime Enterprises Corporation's ("General Maritime") moves to dismiss Sea Trade Maritime Corporation ("Sea Trade") and George Peters' ("Peters") (together "Plaintiffs") Amended Complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and for failure to state a valid claim.  For the reasons that follow, the Court denies General Maritime's motion to dismiss.

## BACKGROUND[1]

Sea Trade is a maritime shipping company which was formed with the corporate purpose of owning a cargo vessel. (Am. Compl. ¶¶ 1, 24, 29.) Although it is organized under the laws of the Republic of Liberia (Id. at ¶ 29), Sea Trade maintains its principal place of business in New York, New York. (Id. at ¶ 1.) Since its formation, Sea Trade has been privately owned and operated by Plaintiff Peters, who is a resident of New York, and various members of his extended family. (Id. at ¶¶ 2 and 30.) In December 1992, Sea Trade purchased the shipping vessel the "Athena." (Id. at ¶ 35.)

General Maritime is a corporation registered in Liberia that maintains its principal place of business is Piraeus, Greece. (Id. at ¶ 6.) Plaintiffs allege that General Maritime manages and operates all of the marine vessels owned by the individual defendant Stelios Coutsodontis ("Coutsodontis"). (Aff. of George C. Peters ("Peters Aff.") ¶ 5.) Coutsodontis is a resident of New York. (Am. Compl. ¶ 3.) Plaintiffs further allege that General Maritime has been a partner and joint venturer of Coutsodontis since 1992. (Peters Aff. at ¶ 4.)

---

[1] For purposes of deciding the motion to dismiss, the Court accepts as true the factual allegations of the Amended Complaint. Capital Mgmt. Select Fund Ltd. v. Bennett, 680 F.3d 214, 219 (2d Cir. 2012).

The instant action is part of an ongoing dispute between Peters and Coutsodontis, who is Peters' uncle, regarding the control of Sea Trade.  (Am. Compl. ¶¶ 12-13.)

Sea Trade was formed in July 1992 by Elias Eliades ("Eliades") with the help of his nephew, Plaintiff Peters.[2]  (Id. at ¶¶ 25 and 29.)  Upon its formation, Sea Trade authorized the issuance of 500 "bearer" shares.  (Id. at ¶ 30.)  Of these shares, 475 were transferred to Eliades, and 25 were transferred to Peters.  (Id.)  Sea Trade's Articles of Incorporation forbid any shareholder from transferring their shares to others without the unanimous written consent of all other shareholders.  (Id. at ¶ 31.)  The Amended Complaint alleges that Eliades included this restrictive provision in the Articles of Incorporation in order to prevent Coutsodontis from becoming a part of Sea Trade. (Id. at ¶ 32.)  The Amended Complaint also alleges that Eliades' exclusion of Coutsodontis from Sea Trade engendered Coutsodontis' animosity towards Peters, as Coutsodontis believed that he should have been the one assisting Eliades.  (Id. at ¶ 25).

Although Athena Eliades ("Mrs. Eliades") was always the nominal president of Sea Trade, since August 1992, Peters was given control of Sea Trade's day-to-day operations through a

---

[2] Eliades' wife, Athena Eliades ("Mrs. Eliades"), is the sister of Coutsodontis and aunt of Peters.  (Am. Compl. ¶¶ 13, 37.)

written agreement which gave him broad power of attorney over the corporation.   (Id. at ¶¶ 33-34.)

On or about July 25, 1994, Eliades cancelled his original 475 shares of Sea Trade and redistributed them as follows: 150 to Anna Peters ("Anna"), 25 shares to Peters, and 300 shares to himself.   (Id. at ¶ 37).   Following this redistribution of shares, Sea Trade was collectively owned by Anna (150 shares), Peters (50 shares), and Eliades (300 shares).   (Id. at ¶ 38.) In September 1996, Eliades died and his wife inherited his 300 shares of Sea Trade.   (Id. at ¶ 39.)

In May of 1997, while in Sri Lanka, the Athena was bombed by terrorists.   (Id. at ¶ 107.)   The Amended Complaint alleges that Coutsodontis interfered with Sea Trade's claim under its "war risk" insurance with Hellenic War Risk Mutual Association ("Hellenic"), and as a result, Sea Trade's indemnification claim was denied.   (Id. at ¶¶ 108-113.)   The Amended Complaint alleges that, as a result of Hellenic denying its claim, Plaintiffs suffered a loss in excess of $5 million.   (Id. at ¶¶ 113.)

The Amended Complaint alleges that, in September 2000, Coutsodontis coerced his sister, Mrs. Eliades, into signing a hand-written agreement by which she transferred to him 250 of her 500 shares of Sea Trade.   (Id. at ¶ 40.)[3]   The Amended

---

[3] The Amended Complaint alleges that the agreement incorrectly stated that Athena owned 500 shares, when in reality, she only owned 300 shares.   (Id. ¶ 40.)

Complaint further alleges that this transfer both: (1) violated Sea Trade's articles of incorporation, and (2) involved a mistaken understanding on the part of an ailing and confused Mrs. Eliades.  (Id. at ¶¶ 41-42.)

Sometime after the original transfer agreement was signed, the Amended Complaint alleges that Coutsodontis again coerced Mrs. Eliades into signing a second agreement which purported to transfer to Coutsodontis 250 of Mrs. Eliades' 300 shares.  (Id. at ¶ 48-49.)  The Amended Complaint alleges that this second agreement was, like the first, in violation of Sea Trade's Articles of Incorporation and the product of coercion.  (Id. at ¶¶ 49-50.)

In January 2003, Mrs. Eliades passed away and Coutsodontis took possession of the 250 shares which he claimed he owned by virtue of the agreements previously signed by Mrs. Eliades. (Id. at ¶¶ 49-50.)[4]

In February of 2005, Coutsodontis filed an action in New York Supreme Court seeking recognition that he was a 50% owner in Sea Trade by virtue of his ownership of 250 shares (the "New York action").  (Id. at ¶ 55.)  The New York action was the first of numerous legal actions that the parties in the instant litigation have pursued in judicial venues across the globe.

---

[4] The Amended Complaint alleges that Coutsodontis went to Mrs. Eliades' home immediately following her death, and that he removed the 250 shares which he claimed ownership of from a safe at that time.  (Id. at ¶ 53.)

(Id. at ¶¶ 55, 63, 69, 89, and 122.)[5]   The Amended Complaint
alleges that, over the course of the New York action,
Coutsodontis made false and defamatory remarks about Peters,
which he later also distributed to various members of the
shipping industry outside the action.   (Id. at ¶¶ 116-18.)   On
February 6, 2006, the New York state court judge dismissed
Coutsodontis' action on a determination that the plaintiff's
claim was flatly contradicted by documentary evidence.   (Id. at
¶ 57.)   The Court did not determine the validity of the two
transfer agreements, instead leaving that matter for the Greek
probate courts.   (Id. at ¶ 58.)

On July 10, 2008, Coutsodontis filed an *ex parte* petition
for the arrest of the Athena in the commercial court of
Tarragona, Spain.   (Id. at ¶ 63.)   As a basis for this petition,
Coutsodontis claimed 50% ownership of the Athena.   (Id. at ¶
64.)   Relying on Coutsodontis' statements in the petition, the
Spanish Court issued an arrest order confining the Athena to
port.   (Id. at ¶ 65.)   The Spanish Court lifted the arrest on

---

[5] The Court notes that the parties in the present action have been involved in
litigation against each other in the following forums: the New York Supreme
Court; the Commercial Court of Tarragona, Spain; the United States District
Court for the Eastern District of Louisiana; the Greek Court; and the Piraeus
Court.   (Id. at ¶¶ 55, 63, 69, 89, and 122.)

August 4, 2008, and determined that the arrest was wrongful and that Sea Trade was entitled to damages. (Id. at ¶¶ 66-67.)[6]

On August 27, 2008, Coutsodontis, for the benefit of all the defendants, filed another complaint to have the Athena placed under arrest. (Id. at ¶ 69.) This time, the complaint was filed in federal district court in the Eastern District of Louisiana. (Id.) Although the Louisiana Court relied on the complaint's claims and initially issued an arrest warrant, on September 12, 2008, the court lifted the arrest and determined that Coutsodontis did not have a claim against the Athena. (Id. at ¶¶ 71-72.)

The Amended Complaint alleges that, as a result of the unlawful arrests of the Athena in Spain and Louisiana, Plaintiffs were injured in an amount in excess of $5 million. (Id. at ¶ 80.)

In October of 2008, as a result of being unable to obtain a charter, Sea Trade called the Athena into port in Gibraltar. (Id. at ¶ 84.) While the Athena was in port, Sea Trade incurred extensive losses. (Id. at ¶ 85.) These losses were so significant that Sea Trade was forced to sell the Athena, or it would be unable to remain a viable corporation. (Id. at ¶¶ 85-86.)

---

[6] Coutsodontis appealed the decision of the Spanish Court, but the appeal was ultimately denied and the lower court's decision affirmed on or about February 26, 2009. (Id. at ¶ 68.)

On January 6, 2009, Sea Trade negotiated the sale of the Athena for $2,625,000. (Id. at ¶ 87.) On January 14, 2009, Coutsodontis, on behalf of all the defendants, applied to the Greek court for an injunction to prevent the sale of the Athena. (Id. at ¶ 89.) The Greek court granted Coutsodontis' request for an injunction, and Sea Trade was unable to complete the sale of the Athena. (Id. at ¶¶ 80, 95-97.)

In January 2009, after Plaintiffs initiated an action in New York Supreme Court seeking an order to prevent Coutsodontis from interfering with the sale of the Athena, Plaintiffs and Coutosodontis came to agreement to allow Sea Trade to sell the vessel. (Id. at ¶¶ 98-99.) As a result of the agreement with Coutsodontis, Sea Trade was able to finalize a deal to sell the Athena for $2,263,437.50 on February 11, 2009. (Id. at ¶ 100.) In addition to the lower renegotiated sale price, as a direct result of the Greek court's injunction, Sea Trade incurred expenses of $10,000 per day for the 22 days over which the sale was delayed. (Id. at ¶¶ 101-02.)

In addition to the foregoing, Plaintiffs further allege that Coutsondontis, along with certain members of General Maritime's management, engaged in an ongoing pattern of interference and defamation. (Peters Aff. ¶ 8.) As evidence of this pattern, Plaintiffs claim that General Maritime's manager Theodore Papangelopoulos ("Papangelopoulos") joined with

Coutosodontis in telling Sea Trade's shareholders that Peters was incapable, lacked the requisite knowledge to run Sea Trade, and was personally lining his own pockets. (Id. at ¶¶ 3, 8b.) Plaintiffs further allege that Papangelopoulos and Coutsodontis demanded internal Sea Trade documents to which they had no right, and then claimed that the failure to provide such information was indicative of fraud. (Id. at ¶ 8c.) Finally, Plaintiffs allege that General Maritime's manager, Nikolaos Kotakis ("Kotakis"), improperly boarded the Athena for the purpose of disparaging management before Sea Trade's shareholders when vessel was in Greece for dry dock. (Id. at ¶ 8d.)

## DISCUSSION

### I. Subject Matter Jurisdiction

General Maritime argues that this Court lacks subject matter jurisdiction over the instant action. General Maritime bases this argument on the assertion that, since Plaintiffs' claims are not maritime in nature, this Court cannot exercise subject matter jurisdiction pursuant to 28 U.S.C. § 1333.

### A. Pleading Standard

"Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff need only make a prima facie showing of subject matter jurisdiction" in order to survive a motion to dismiss. Korea Exp. USA, Inc. v. K.K.D. Imports, Inc., 103 F.

Supp. 2d 682, 686 (S.D.N.Y. 2000) (citing Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994)). In determining whether the plaintiff has met its burden, the Court "accept[s] as true all material factual allegations in the complaint" and "may also consider evidence outside the pleadings, such as affidavits." Id. at 685-86. (internal citations omitted). Although the Court construes jurisdictional allegations liberally, "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." Robinson, 21 F.3d at 507.

Plaintiffs argue that subject matter jurisdiction over the instant action is proper under § 1333, which provides that the district courts shall have original jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction . . . ." 28 U.S.C. § 1333(1). A party alleging maritime jurisdiction pursuant to 28 U.S.C. § 1333(1) must satisfy a two-part test comprised of "conditions both of location and connection with maritime activity." Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995). To meet the location test, a court must determine "whether the tort occurred on navigable waters or whether injury suffered on land was caused by a vessel on navigable water." Id. To satisfy the connection test, the Court must conduct a two-prong inquiry. First, the Court "must assess the 'general features of the type of incident involved'

to determine whether the incident 'has a potentially disruptive
impact on maritime commerce.'" Id., 513 U.S. at 534 (internal
citations omitted).  Second, the Court "must determine whether
the 'general character' of the 'activity giving rise to the
incident' shows a 'substantial relationship to traditional
maritime activity.'" Id. (internal citations omitted).

### B. Establishing Subject Matter Jurisdiction

Plaintiffs primarily allege two torts that they argue give
rise to maritime jurisdiction: (1) interference with the sale of
the Athena; and (2) the wrongful arrests of the Athena.  (Mem.
in Opp. of Mot. to Dismiss 20, 22-25.)

### 1. Interference with Sale

With respect to Plaintiffs' attempts to establish subject
matter jurisdiction through individual defendant Coutsodontis'
alleged interference in the sale of the Athena, Am. Compl. ¶¶
87-90, the Court finds Plaintiff's arguments unavailing.
Plaintiffs have not alleged interference with an executed
charter, only interference with a contract for the sale of the
vessel.  It is well settled that, while a contract for the use
or charter of a vessel is maritime in nature, the contract for a
sale of a vessel is non-maritime.  See, e.g., The Ada, 250 F.
194, 196 (2d Cir. 1918); Vera, Inc. v. Tug "Dakota", 769 F.
Supp. 451, 456 (E.D.N.Y. 1991); and Int'l Shipping Co., S.A. v.
Hydra Offshore, Inc., 675 F. Supp. 146, 150 (S.D.N.Y. 1987).

Accordingly, the Court finds that it lacks subject matter jurisdiction pursuant to 28 U.S.C. § 1333 for Plaintiffs' claims relating to the interference of the sale of the Athena. The Court turns next to Plaintiffs' argument that the Court has subject matter jurisdiction over claims relating to the arrests of the Athena.

### 2. Wrongful Arrests

As an initial matter, since the Amended Complaint alleges that the arrests of the Athena occurred on navigable waters, Am. Compl. ¶¶ 63-67, and 69-72, the Court finds that Plaintiffs' claims relating to the arrests of the Athena satisfy the location test for purposes of establishing jurisdiction under 28 U.S.C. § 1333(1). The connection test requires, however, a more detailed analysis. In their motion to dismiss, General Maritime argues that Plaintiffs have failed to satisfy either the first or second prongs of the "connection test" for subject matter jurisdiction.

With regards to the first prong, General Maritime argues that Plaintiffs have failed to show that the arrest has a potentially disruptive impact on maritime commerce because Plaintiffs have failed to "allege any maritime losses arising from arrests, such as extra fuel charges, demurrage, or crewing charges" nor have they alleged "any lost charges proximately caused by the arrests." (Mem. in Supp. of Mot. Dismiss 23.)

The Court finds that General Maritime's argument construes the first prong of the connection test too narrowly. When considering whether the Plaintiffs have alleged an incident which potentially disrupts maritime commerce, the Court must consider "a description of the incident at an intermediate level of possible generality." Grubart, 513 U.S. at 538. Courts should therefore look more to the incident's potential effects, rather than its particular facts. Id.

In the instant case, the "general features of the type of incident involved" can be characterized as an arrest of a vessel docked in navigable waters and/or alleged misrepresentations to the courts that led to the arrest of the vessel at port. The Court finds that either category of incident has the potential to disrupt maritime commerce. See also Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co. Ltd., 436 F.3d 349, 356 (3d Cir. 2006), rev'd on other grounds, 549 U.S. 422 (1963). The Court therefore finds that Plaintiffs have satisfied the first prong of the connection test for maritime subject matter jurisdiction.

In addition to arguing that Plaintiffs have failed the first prong of the connection test, General Maritime also argues that Plaintiffs fail the test's second prong because the allegations "do not describe the type of activity that bears a substantial relationship to traditional maritime activity." (Mem. in Supp. of Mot. Dismiss 22.)

When undertaking the second prong of the connection test, the court asks "whether a tortfeasor's activity, commercial or noncommercial...is so closely related to the activity traditionally subject to admiralty law that reasons for applying special admiralty rules would apply in the suit at hand." Grubart, 513 U.S. at 539-40.  In making this determination, the Supreme Court has held that a "broad perspective" should be used, and has declined to hold that navigation is the only activity that could satisfy the substantial relationship test. Malaysia Int'l Shipping, 436 F.3d at 356-57 (citing Sisson v. Ruby, 497 U.S. 358, 367 (1990)).

Looking broadly at the allegations of the Amended Complaint, it makes no difference whether the general character of the activity is characterized as a wrongful arrest of a vessel, or a claim by a shareholder seeking control of a corporation by making misrepresentations that gave rise to the arrest of the vessel.  (Mem. in Supp. of Mot. Dismiss 22-23.) In either case, the Court finds that the activity is closely related to the activity traditionally subject to admiralty law. See Malaysia Int'l Shipping, 436 F.3d at 357 ("Asking a court to have a vessel arrested . . . is a well-established method of granting an admiralty court power to exercise authority over a ship, and thus has a substantial relationship to traditional maritime activity.") (internal citations omitted).

Having found that the wrongful arrests of the Athena satisfy both the location test and the connection test, the Court finds that it has subject matter jurisdiction over General Maritime for the claims stemming from this tort.  Since the Amended Complaint's remaining claims "derive from a common nucleus of operative fact," United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966), as the claims relating to the arrests, the Court finds that it may exercise supplemental jurisdiction over all of Plaintiffs' claims under 28 U.S.C. § 1367(a).[7]

## II.   Personal Jurisdiction

In addition to asserting that this Court lacks subject matter jurisdiction over the Amended Complaint, General Maritime also moves to dismiss Plaintiffs' claims on the grounds that this Court lacks personal jurisdiction over it.

### A. Standard of Review

To survive a motion to dismiss pursuant to Rule 12(b)(2) prior to discovery, Plaintiffs need only make a prima facie showing that personal jurisdiction exists.  Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir.1985). "In the absence of an evidentiary hearing on the jurisdictional

---

[7] The Court notes that Plaintiffs have also argued that maritime subject matter jurisdiction attaches to the Amended Complaint's claims of interference with maritime charters and defamation of Peters.  (Mem. in Opp. of Mot. to Dismiss 20-21.)  Since the Court finds that it has maritime jurisdiction over the claims relating to the arrests of the Athena, and has supplemental jurisdiction over all other claims, it need not reach these alternative arguments.

allegations, or a trial on the merits, all pleadings and

affidavits are construed in the light most favorable to

plaintiff, and where doubt exists, they are resolved in the

plaintiff's favor." Id. The Court does not, however, "accept

conclusory allegations or draw argumentative inferences." In re

Terrorist Attacks on September 11, 2001, 392 F. Supp.2d 539, 556

(S.D.N.Y. 2005) (citations omitted).

### B. C.P.L.R. § 302(a)

Plaintiffs assert personal jurisdiction over Defendant

pursuant to New York's long-arm statute, C.P.L.R.. § 302(a),

which provides for jurisdiction over any non-domiciliary

defendant, who in person or through an agent:

(1) transacts any business within the state...; or (2)
commits a tortious act within the state, except as to a cause of
action for defamation of character arising from the act; or (3)
commits a tortious act without the state causing injury to
person or property within the state, except as to a cause of
action for defamation of character arising from the act,...; or
(4) owns, uses, or possess any real property situated within the
state.

Plaintiffs specifically argue that the Court has personal

jurisdiction over General Maritime under Sections 302(a)(1) and

(2) because of the actions of General Maritime's agent and co-

conspirator Coutsodontis. (Mem. in Opp. of Mot. to Dismiss 14-

19.)

### C. Personal jurisdiction on a conspiracy theory

It is settled that co-conspirators may be considered "agents" for establishing personal jurisdiction under Section 302(a).  See In re Terrorist Attacks, 392 F. Supp.2d at 557; Cleft of the Rock Found. v. Wilson, 992 F. Supp. 574, 581 (E.D.N.Y. 1998); Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991); Foremost Guar. Corp. v. Public Equities Corp., No. 86 Civ. 6421, 1988 WL 125667, at *4 (S.D.N.Y. Nov. 10, 1988) (determining co-conspirators as agents under CPLR §302(a)(1)).

To establish personal jurisdiction on a conspiracy theory, Plaintiffs must satisfy two requirements.  Plaintiffs must: (1) "make a prima facie showing of conspiracy; and (2) [] allege specific facts warranting the inference that the defendant was a member of the conspiracy."  Chrysler Capital Corp., 778 F. Supp. at 1266 (internal citations omitted).  When considering whether plaintiffs have made a prima facie showing, "great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of the pleading."  Maersk, Inc. v. Neewra, Inc., 554 F. Supp. 2d 424, 458 (S.D.N.Y. 2008) (internal citations omitted).

### 1. Prima facie showing of conspiracy

In order to make their prima facie showing of conspiracy, Plaintiffs must allege a primary tort and four elements: "(a) a

corrupt agreement between two or more persons, (b) an overt act
in furtherance of the conspiracy, (c) the parties' intentional
participation in the furtherance of a plan or purpose, and (d)
the resulting damage or injury.  Chrysler Capital Corp., 778 F.
Supp. at 1267.

    With respect to the first element of a conspiracy, a
corrupt agreement, the Court notes that, "[t]he lack of an
express allegation of an agreement is not fatal to the
plaintiffs' conspiracy claims."  First Fed. Savings and Loan
Assn. of Pittsburgh v. Oppenheim, Appel, Dixon & Co., 629 F.
Supp. 427, 443 (S.D.N.Y. 1986).  "The courts have held that
disconnected acts, when taken together, may satisfactorily
establish a conspiracy."  Id. at 443-44.  In affidavits
submitted in opposition to General Maritime's motion, Plaintiffs
have alleged numerous acts to suggest that Coutsodontis and
General Maritime entered into a common plan to wrest control of
Sea Trade.  (Peters Aff. ¶ 8.)  These allegations include claims
that: (1) together with Coutsodontis, General Maritime's
manager, Papangelopolous, regularly and falsely accused Peters
of mismanagement before Seatrade's shareholders; (2)
Papangelopolous, along with Coutsodontis, improperly requested
proprietary information from Sea Trade; and (3) accompanied by
Coutsodontis, General Maritime's manager, Kotakis, improperly
boarded the Athena for the purpose of disparaging Sea Trade's

management.  (Peters Aff. ¶¶ 8-9.)  In light of these allegations, the Court finds that Plaintiffs have set forth sufficient facts to establish a corrupt agreement at the pleading stage.

The Court similarly finds that Plaintiffs have sufficiently pled the second conspiracy element by alleging several overt acts in furtherance of the conspiracy.  In addition to the acts which Plaintiffs allege were undertaken by Papangelopolous and Kotakis (Id. at ¶¶ 8-9), Plaintiffs have also alleged that Coutsodontis' arrests of the Athena and interference with its sale were also undertaken in furtherance of the conspiracy. (Am. Compl. ¶¶ 78, 103, 131, 139, and 142.)[8]

The Court finds that the overt acts alleged to have been undertaken by Papangelopolous and Kotakis also satisfy the third element of a conspiracy claim, as "[t]he defendant[]'s intentional participation in furtherance of the conspiracy [can] be inferred from the overt acts taken by them."  See Cleft of the Rock, 992 F. Supp. at 582 (citing Andre Emmerich Gallery, Inc. v. Segre, No. 96 CIV. 889, 1997 WL 672009, at *5 (S.D.N.Y. Oct. 29, 1997)).

---

[8] The Court notes that General Maritime has argued that Plaintiff has failed to allege any overt acts undertaken by General Maritime.  (Mem. in Supp. of Mot. Dismiss 10.)  Setting aside the acts which Plaintiffs' affidavit alleges were undertaken by Papangelopolous and Kotakis, the Court notes that the Amended Complaint's allegations regarding Coutsodontis are sufficient to establish an overt act, as the plaintiff need only allege "that there have been at least one overt act by one of the conspirators in furtherance of the unlawful plan."  Chrysler Capital Corp., 778 F. Supp. at 1267. (emphasis added).

Finally, the Court finds that Plaintiffs have satisfied the fourth element of conspiracy by claiming that they suffered millions of dollars of losses as a result of the Defendants' interference in Sea Trade's business.  (Am. Compl. ¶¶ 80, 96, 102, 105, and 112.)

### 2. Defendant's membership in the conspiracy

Having determined that Plaintiffs have sufficiently pled a prima facie case of conspiracy, the Court now considers whether Plaintiffs have satisfied the second requirement of establishing personal jurisdiction on a conspiracy theory.  Namely, the Court considers whether Plaintiffs have alleged facts sufficient to warrant an inference that General Maritime was a member of the conspiracy.  In order for the Court to draw such an inference, Plaintiffs must show that: (a) General Maritime had an awareness of the effects in New York of the activity, (b) the activity of Coutsodontis, the New York co-conspirator, was for the benefit of General Maritime, and (c) Coutsodontis acted "at the direction or under the control" or "at the request of or on behalf of" General Maritime.  See Chrysler Capital Corp., 778 F.Supp. at 1269.

Having considered both the Amended Complaint and the Affidavit of George C. Peters which was filed in support of Plaintiffs' opposition to the instant motion, the Court finds that Plaintiffs have sufficiently alleged facts sufficient to

support an inference that General Maritime had an awareness of the effects of its activity in New York. The Amended Complaint states that Sea Trade maintains its principal place of business is New York City and that Peters resides in New York City. (Am. Compl. ¶¶ 1-2.) Since Plaintiffs have also alleged that General Maritime's managers, Papangelopolous and Kotakis, joined with Coutsodontis in disparaging Sea Trade's management and interfering with its operations (Peters Aff. ¶¶ 8-9), the Court finds it reasonable to infer from these allegations that General Maritime would know the effect of its actions in New York.

The Court also finds that Plaintiffs have shown that the activity of Coutsodontis, the co-conspirator in New York, was to the benefit of General Maritime. Plaintiffs allege that Coutsodontis' marine vessels are all managed and operated by General Maritime (Id. at ¶ 5), and that General Maritime would directly profit if control over Sea Trade was transferred from Peters to Coutsodontis (Id. at ¶ 6). Plaintiffs further allege that General Maritime receives substantial fees for managing Coutsodontis' ships. (Id. at ¶ 7). In light of all these allegations, the Court finds that Plaintiffs have demonstrated that General Maritime would benefit from Coutsodontis' attempts to wrest control of Sea Trade and the Athena.

The final requirement for establishing a sufficient relationship between a non-domiciliary defendant and the

conspiracy is whether the New York co-conspirator acting in New York "acted at the direction or under the control or at the request of or on behalf of the out-of-state defendant." Chrysler Capital Corp.,778 F. Supp. at 1269 (internal quotations omitted). The Court finds that Plaintiffs have met this requirement. As has already been discussed, Plaintiffs allege that managers of General Maritime knowingly and actively participated with Coutsodontis in disparaging Peters and interfering with Sea Trade operations in a joint effort to wrest control of Sea Trade (Peters Aff. ¶¶ 8-9), and that General Maritime also stood to profit from Coutsodontis gaining control of Sea Trade (Id. at ¶ 4-7.) It is therefore reasonable to infer from these facts that, any actions taken by Coutsodontis in an effort to transfer control of Sea Trade from Peters to himself were taken "on behalf of" General Maritime as well.

For the reasons discussed, viewing the allegations in the Amended Complaint and the Peters Affidavit in a light most favorable to Plaintiffs, the Court finds that Plaintiffs' allegations are sufficient to warrant an inference that General Maritime was a member of the conspiracy.

### D. Actions within New York State

Having determined that the Court may consider Coutsodontis a co-conspirator of General Maritime for the purpose of exercising personal jurisdiction over General Maritime, the

Court now addresses whether Plaintiffs have alleged actions by
Coutsodontis that would make personal jurisdiction under
C.P.L.R. § 302(a) appropriate.  As already discussed, under New
York's long arm statute, the Court can exercise personal
jurisdiction over an out-of-state defendant whose co-
conspirator: (1) transacts any business within the state; (2)
commits a tortious act within the state; (3) commits a tortious
act outside the state that causes injury within the state; or
(4) owns, uses, or possess any real property within the state.
N.Y. C.P.L.R.. § 302(a).  The Amended Complaint alleges that Sea
Trade's principal place of business is New York.  (Am. Compl. ¶
1.)  The Amended Complaint also alleges that both Coutsodontis
and Peters are residents of New York (Id. at ¶¶ 2 and 3), and
that Coutsodontis filed an action in New York state court in an
attempt to interfere with Sea Trade's business.  (Id. at ¶¶ 55
and 60.)  In light of these allegations, and the allegedly
tortious activity already discussed at length elsewhere in this
opinion, the Court finds that Plaintiffs have adequately pled
sufficient New York contacts to bring General Maritime under the
personal jurisdiction of this Court under the long arm statute.

## III.  Failure to State a Claim

The Court addresses last General Maritime's argument that
the Amended Complaint should be dismissed for failure to state a
claim.  General Maritime's argument in this respect rests on its

contention that Plaintiffs have failed to "allege that General Maritime did anything" and that Plaintiffs have failed to establish that Coutsodontis acted as an agent, alter ego, or co-conspirator of General Maritime.  (Mem. in Supp. of Mot. Dismiss 7-10.)  For the reasons set out in detail in the Court's discussion of personal jurisdiction, the Court disagrees with General Maritime and finds instead that Plaintiffs have sufficiently alleged a conspiracy between Coutsodontis and General Maritime.  Since "[t]he allegations of conspiracy serve to enable a plaintiff to connect a defendant with the acts of his co-conspirators where without it he could not be implicated," Cuker Indus., Inc. v. William L. Crow Constr. Co., 178 N.Y.S.2d 777, 779 (N.Y. App. Div. 1958), the Court finds that the Amended Complaint sufficiently pleads a claim in order to survive a motion to dismiss.[9]

CONCLUSION

For the reasons states above, General Maritime's motion to dismiss is **DENIED** in its entirety.

The Clerk of the Court is directed to terminate motion #42 on the ECF docket.

---

[9] The Court also notes that, in the Peters Affidavit which was submitted in support of Plaintiffs' opposition to the instant motion, Plaintiffs have additionally alleged tortious actions on the part of General Maritime's managers themselves.  (Peters Aff. ¶¶ 8-9.)

SO ORDERED:

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Dated:     New York, New York
           August 15, 2012