UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

SEA TRADE MARITIME CORPORATION and
GEORGE PETERS,

                *Plaintiffs,*

        -against-

STELIOS COUTSODONTIS, FRANCESCA
COUTSODONTIS, GENERAL MARITIME
ENTERPRISES CORPORATION, ATTIKA
INTERNATIONAL NAVIGATION S.A., and IASON
SHIPPING LTD.,

                *Defendants.*

No. 09 Civ. 488 (LGS)(HBP)

**AFFIDAVIT OF ANNA PETERS**

------------------------------------------------------------------x

State of New York  )
                     ): SS:
County of New York )

I, ANNA PETERS, being duly sworn, deposes and says:

1. I am the sister of Stelios Coutsodontis ("Steve") and am familiar with many events relevant to the above-referenced action.

2. The harassment and attempts to break up Sea Trade's operations began in 1993 under Theodore Papagelopoulos ("Papagelopoulos) of General Maritime, the father of the present owners of General Maritime shortly after Sea Trade Maritime Corporation's ("Sea Trade") purchase of the Motor Vessel ("M/V") ATHENA. Stelios Coutsodontis ("Steve"), together with his cousin Papagelopoulos, began to disparage and discredit Plaintiff George Peters ("George"), my son, and Trans-Ocean, Sea Trade's U.S. agent, and obtain control of the M/V Athena for themselves.

3. These attempts to damage Sea Trade intensified after the health of Elias Eliades ("Elias"), the founder of Sea Trade, began to suffer. After the death of Papagelopoulos, these attempts continued under the present owners of General Maritime, his daughter Ekaterini Kotakis and Nikolaos Kotakis.

4. My brother-in-law Elias entrusted George with the management of his new company and appointed George to represent his shipping interests. Unfortunately, Steve was

1

jealous and offended that Elias decided to place his confidence in George, who was much younger than Steve, rather than trust Steve a further time with a new shipping venture. Elias instructed George that Steve was never to have any involvement in any company he created, including Sea Trade. During the summer of 1992, when Elias discussed Sea Trade's business with George, Elias required George to give his word that Steve would have no involvement of any kind with his new company.

5. Elias had good reason not to trust Steve with his business. Elias had, on three previous occasions, at the behest of Athena Eliades ("Athena"), my sister and his wife, invested with Steve in the shipping industry. Each time the investment failed under circumstances in which Elias was convinced that he had been defrauded. On one occasion, Steve had convinced Elias to invest in a shipping group involving the Tsavaris family. The venture failed dismally and Elias lost his entire investment. Elias determined never again to do business with Steve. Later, Steve begged me several times for financial assistance saying that he had been "ruined" by the litigation resulting from the Tsavaris investment. I was not in a position to help him financially. So I asked my sister Athena to help him as he was in dire straits and liable to lose his house. Although Athena was afraid of Elias's reaction if he discovered that she was helping Steve again, she eventually sent him $3 million to help him out with his difficulties. At this time, I also gifted to him one-third of the family home and property on the island of Syros. I hoped that this would help him with his difficulties.

6. Elias's isolation of Steve caused Steve to resent Elias and George. Steve set out to gain control of Sea Trade for himself and General Maritime. He wanted General Maritime to manage Sea Trade's sole asset, the M/V ATHENA. General Maritime managed Steve's other shipping interests. To accomplish this, his tactic was to pressure Athena when she became the majority shareholder and try to discredit George.

7. Steve constantly tried to tarnish my son's reputation in the eyes of my sister, Athena. He would falsely allege that my son embezzled Sea Trade money, wasted its corporate assets, and acted against the best interests of the company. Steve would falsely tell her that Trans-Ocean, and its Greek parent company, Natalca, were colluding with George. One example was when George assigned the logistical support of the ship to Trans-Ocean. It was common practice to paint the symbol of the support company on the ship's smokestack. Steve managed to convince my sister that Natalca/Trans-Ocean was colluding with George to steal the ship.

Totally ignorant of the shipping business and business in general, Athena was so shaken by this ridiculous allegation that she began to suspect that George was actually trying to steal the M/V ATHENA. Although George traveled from New York to Greece to reassure her that this was not true, she was still shaken by these malicious allegations. Steve's purpose in making these allegations was to destroy the relationship of trust between my son and his aunt, Athena.

8. A second scheme Steve used to harm the company was to convince my sister that all the net revenue earned by the ship should immediately be paid out to her rather than remain in the company, otherwise, it would be lost. Steve said these things knowing that in the shipping business cash is necessary for a company to operate, especially if unforeseen circumstances require money for expenses or repairs. Steve tried to strip the company of cash so that, if we ran into any difficult circumstances, Sea Trade would have to cease operations.

9. A third scheme Steve used was to convinced my sister, who had no experience in business, that Sea Trade should repay a loan in advance that my son had obtained from a bank. The purpose of this was the same as before: To deprive the company of money and weaken it so it would have to struggle to survive. This was his only motive since he had no way of knowing if Sea Trade needed the loan to operate the business. There had been a clause in the mortgage agreement, which required that present management to remain the same. Steve knew he could not change the present management of Sea Trade and move Sea Trade's present management to General Maritime until the mortgage was repaid. The different schemes used by Steve to take over Sea Trade, hinder its operations, or destroy it are too many to be recounted here.

10. Steve and General Maritime's constant disparagement of George and Trans-Ocean, Sea Trade's management company, continued year after year. They repeatedly told Athena that George and Trans-Ocean were mismanaging, wasting assets, and that Elias's investment would be lost. My sister would often call me from Athens in tears and in great distress and extremely agitated due to this pressure. This brainwashing of my sister, who was a severe alcoholic and in ill health, was so forceful and endless that I believe it caused her health to deteriorate even more. Living alone in Athens, with her husband, Elias, recently deceased, she was unable to withstand the pressure of Steve on one side and General Maritime on the other. She also had no experience in the shipping industry and no business experience of any kind. So she was unable to know the truth, or lack of it, in what Steve and his cousins at General Maritime were telling her.

11. Concerned about the damage to the reputation of everyone involved in the management of the M/V ATHENA, Theo Vatis of Trans–Ocean felt compelled to write a letter to deny the false allegations made by Steve and General Maritime and gently reassure her that the M/V ATHENA was being managed honestly and with integrity.

12. Nevertheless, on several occasions my sister called me from Greece, still in a terrible state of distress, saying that she would be forced to change Sea Trade's management and have the M/V ATHENA managed by Steven and General Maritime, who managed Steve's other ships. I was able to dissuade her only by forcefully reminding her of Elias's specific wishes and strict instructions.

13. But Steve continued his efforts to gain control of Sea Trade. I learned from my son George that when he had traveled to Greece to attend the dry-docking and special survey of the M/V ATHENA at one of the Greek shipyards, Steve, over the objections of George and Trans Ocean, Sea Trade's management company at the time, brought the principals and personnel of General Maritime on board the M/V ATHENA to observe the work being done and disparage it to Athena. This had the effect of making her suspicions of George and Trans-Ocean worse.

14. Later, when my sister, Athena, visited me in New York, Steve insisted she call a meeting of all of Sea Trade's shareholders even though he was not a shareholder. The meeting was held in my home where my sister was staying with me. My sister, Steve, my son, and myself were all present. There were two purposes to the meeting. First, Steve tried to convince my sister that the management of Sea Trade was in bad hands, that George should be removed from its management, and that only Steve had the skill, expertise and connections to manage the M/V ATHENA. Second, he tried to gain custody of Sea Trade's corporate documents. Steve claimed that it was Athena who wanted these documents, even though it was him who wanted them. Steve demanded that George produce to him all of Sea Trade's documents, including every invoice produced by the M/V ATHENA from Sea Trade's formation to the present.

15. When George suggested that he could not possibly want all invoices produced by Sea Trade, Steve became angry and demanded all the invoices ever produced, even for "every head of lettuce." George reminded my sister of her husband, Elias's, wishes for Sea Trade and that he could not in good conscience follow Steve's demands because he had given his word to Elias not to involve Steve with Sea Trade's affairs. Further, when George had visited Athena in

4

Greece, Athena had promised Steve that she would respect Elias's wishes that there would be no change in Sea Trade's current management.

16. At this point, Steve became very angry and abusive. He told my sister that "it is obvious that George is not going to cooperate" and that they had better engage General Maritime's lawyer in Piraeus. Steve has always consulted this lawyer. General Maritime had also told Steve that that their lawyer would "be able to force George to turn over the documents."

17. Sharing a lawyer and gaining control of Sea Trade were not the only things connecting General Maritime and Steve. Athena had told me that General Maritime and Steve were sharing ownership interests in General Maritime's ships. Specifically, Steve had acquired a 40% interest in the M/V AFTOKRATIRA IRINI, while General Maritime held a 60% interest in it. In addition, Steve had acquired a 40% interest in the M/V THEODORUS, while General Maritime held a 60% interest in it. Also, not long after the purchase of the M/V ATHENA, Papagelopoulos persuaded Athena to invest several million dollars as a minority interest in a ship named the M/V KARTERIA. Athena told me she had given her shares to Steve and that Steve would manage the ship together with his cousins at General Maritime.

18. In 2003, Steve acquired the M/V ATHENOULA, and placed the ship under the company, Attika International Corp. ("Attika"). General Maritime managed this ship along with Steve's other shipping interests. I know this because I was present in Switzerland when Steve asked the Mimoza Trust to release $3 million from his personal trust, before making any other distributions because he needed this money as a down payment for the purchase of the M/V ATHENOULA. He needed the money immediately because the transaction was soon set to close.

19. It is astonishing that despite the great wealth and shipping interests Steve had acquired with General Maritime, he would not give up his desire for revenge against Elias and George. He continued to do everything possible to defame George to Athena, who was now Sea Trade's majority shareholder.

20. I have intimate knowledge of all of these events and Steve's motives because I was very close to Athena, my sister, and have witnessed many of them myself. Over the years, I would travel to Greece to be with her during the summer and accompany her to the island of Syros where we had grown up. Whenever she came to the United States she would stay with me in New York. I would also travel to Greece to bring her to the Johns Hopkins Medical Center in

Maryland when she needed medical treatment; accompany her to London for the same purpose; or bring her from Greece to the Betty Ford Center in California for her to receive treatment for her alcoholism. In contrast, Steve showed absolutely no interest in her until after Sea Trade purchased the M/V ATHENA. It was only then that he began to show an interest and give her shipping and financial advice even though all of his shipping ventures had failed.

21. After Elias died, my sister's health began to decline rapidly. Her ill health and alcoholism made her even more incapable of resisting Steve and General Maritime's combined pressure. This constant pressure exacerbated her health problems.

22. Very soon after Athena's deterioration began, Steven took her to notary publics in Greece to have her sign several handwritten notes purporting to give him shares in Sea Trade. What was peculiar was that Athena already had a will prepared by a lawyer in July 1999. Nevertheless, while vacationing on the island of Syros in August 2000, Steve insisted that my sister and I accompany him to a notary public on the island. We entered a large office where the notary was waiting with perhaps a dozen witnesses, mostly sailors. I later learned that Steve had requested them to attend. My sister sat silently, overwhelmed by the formality and the intimidating scene. The notary began to read from an already prepared document.

23. When the notary described her as the owner of 500 shares (100% of Sea Trade), I spoke up and told her that she could not sign any such document since she did not own 500 shares. She said, "you know, you are right " and asked that the document be returned to her. However, the notary refused. Later, Steve learned that Athena did only own 300 shares. Knowing that this could be a problem for him, one month later, Steve persuaded my sister to sign a second note, this time stating the correct number of shares. Nevertheless, during summers on the island of Syros and in Athens, whenever others were present, Steve encouraged her to claim that she was the sole 100% owner of Sea Trade.

24. This was all part of a comprehensive scheme to take all of Athena's property. My sister had told me that Steve needed money to invest with his cousins at General Maritime in various ships they managed for Steve. He managed to extract substantial funds from her and her bank accounts. The money included the revenue from her family's soya processing plant and the profits she had received as a shareholder of Sea Trade. The pressure Steve put on her was so great that, after the execution of her July 15, 1999 will, he forced her to sell two of the three properties devised under the will, namely, her joint ownership of 50% of the property at 21

6

Dodekanisou Street, Thessaloniki, Greece and the fourth floor apartment in the building at 21 Voukourestiou Street, Athens, Greece. The relevant clause in my sister's July 15, 1999 will that suggests that Steve drained much of the Eliades family's wealth reads as follows: " IF THE SAID FRANTZESKA COUTSODONTIS, DAUGHTER OF STEVE ( OR STEPHEN ), OR THE OTHER HEIRS ( IN THE EVENT THAT SHE RENOUNCES MY SUCCESSION ) INVOKE ANY FINANCIAL NEED IN ORDER TO SELL MY SAID HOUSE SUCH INVOCATION SHALL BE GROUNDLESS, BECAUSE THEY HAVE BENEFITED FROM MY AND MY HUSBAND'S GENEROSITY IN THE PAST TO SUCH AN EXTENT THAT THEY HAVE SOLVED THEIR FINANCIAL PROBLEMS FOR LIFE "

       25.     Steve ignored this provision, however. Just one year later, he succeeded in pressuring Athena into signing the two conflicting notes purporting to leave him shares in Sea Trade – the one signed at the office of the notary in August 2000, and the second one in September 2000 after he had learned the correct number of shares that she owned. Both these notes were against her husband's wishes. In this way, Steve was able to claim the Sea Trade shares he had had always wanted from the day Sea Trade was formed, against the wishes of Elias, the company's founder.

       26.     Thus, through this improper claim to shares, Steve was able to seek the destruction of Sea Trade, a company that my son had worked hard for many years to build, and a company Elias wanted him excluded from. He accomplished this by repeatedly arresting the M/V ATHENA, and destroying my son's reputation by constantly disparaging him. Steve even called my son a forger.

       27.     This accusation was false. I was present in Athens during the summer of 1992 with Elias when he directed Athena to go to the Liberian Consulate and sign the power of attorney so George would be able to act in all respects for the new company. So I was also present at the Consulate with Athena and George when Athena signed the power of attorney in the presence of the consul and a notary public.

7

28.     It was only when Steve did not succeed in entering Sea Trade in 2004, after my sister's death, that he began to say the power of attorney was a forgery in order to destroy George's reputation in the shipping industry.  Later, in 2008, he began to repeatedly arrest Sea Trade's sole asset, the M/V ATHENA.  These arrests effectively destroyed Sea Trade.

Dated:  New York, New York
        February 18, 2015

                                             *Anna C. Peters*
                                    _____
                                             Anna Peters
                                             910 Park Avenue
                                             New York, NY 10021

| |
|---|
| Index No. 09 Civ. 488 (LGS) (HBP) |
| UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK |
| SEA TRADE MARITIME CORPORATION and GEORGE PETERS,<br><br>Plaintiff,<br><br>-against-<br><br>STELIOS COUTSODONTIS, FRANCESCA COUTSODONTIS, GENERAL MARITIME ENTERPRISES CORPORATION, ATTIKA INTERNATIONAL NAVIGATION S.A., and IASON SHIPPING LTD.,<br><br>Defendants. |
| **AFFIDAVIT OF ANNA PETERS** |
| Beys Stein Mobargha & Berland, LLP<br>Attorneys for Plaintiff<br>405 Lexington Avenue, 7th floor<br>New York, New York 10003<br>T: (646)- 755-3603<br>F: (646) 755-3599<br><br>nmobargha@blmblaw.com |
| Service a copy within _____ is hereby admitted.<br><br>Dated,                                                       _____<br>                                                                          Attorney(s) for |