**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SEA TRADE MARITIME CORPORATION and
GEORGE PETERS,                                    **No. 09 Civ. 488 (LGS)(HBP)**

                        *Plaintiffs,*

             -against-

STELIOS COUTSODONTIS, *et al.,*

                        *Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Pursuant to the Court's order, dated October 1, 2015, Plaintiffs Sea Trade Maritime

Corporation ("Sea Trade") and George Peters ("Peters") submit the following Proposed Findings

of Fact and Conclusions of Law.

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**PROPOSED FINDINGS OF FACT**

***Formation of Sea Trade***

       1.     Elias Eliades ("Elias") formed Sea Trade and organized the company under the

laws of the Republic of Liberia in July of 1992.

       2.     Elias was the husband of Athena Eliades ("Athena").  Athena is the sister of

Defendant Stelios Coutsodontis ("Coutsodontis") and Anna Peters ("Anna").  Athena is the aunt

of George Peters.  Anna is the mother of George Peters.

       3.     Sea Trade's Certificate of Incorporation authorized the issuance of 500 shares.

       4.     The names of Sea Trade's stockholders are listed in official Sea Trade documents,

including a corporate registry.

5.      Upon the formation of Sea Trade, Peters received 25 shares.

6.      Upon the formation of Sea Trade, Elias received 475 shares.

***Elias did not want Coutsodontis to have any role in Sea Trade***

7.      Elias did not give Coutsodontis any role in Sea Trade.  Neither Elias nor Athena Elias appointed Coutsodontis as an executive.  They also did not appoint him as the attorney-in-fact.  Finally, Elias did not give a single share of Sea Trade to Coutsodontis.

8.      Elias's refusal to allow Coutsodontis to have any role in Sea Trade was due to his past business experiences with him.

9.      Elias had known Coutsodontis for 40 years from 1956 until 1996.

10.     Elias invested in Trans-Ocean Steamship Agency ("Trans-Ocean"), a company in which Coutsodontis had also invested.   Coutsodontis worked at Trans-Ocean from 1956-1968.

11.     In 1968, Elias again invested in one of Coutsodontis's companies, Sea Master Shipping.  Coutsodontis worked at Sea Master Shipping from 1968-1976.

12.     Elias invested in Coutsodontis's companies "for 20 straight years and lost money."

***Elias put a key restriction in the Articles of Incorporation to keep Coutsodontis out of the company***

13.     Due to this history, Elias did not want Coutsodontis to have any role in Sea Trade. In order to keep Coutsodontis from participating in Sea Trade's business, Elias and Peters agreed to restrict the admission of new shareholders unless there was unanimous consent among the shareholders.

14.     Specifically, Sea Trade's Articles of Incorporation (the "Articles") provide: "No shareholder of the Corporation shall have the right or power to sell, assign, transfer or otherwise dispose of all or any part of the shares of stock of the Corporation to a person who is not already a shareholder without first obtaining the unanimous written consent of all the other shareholders

of the Corporation."

15.   The restriction was so important for Sea Trade shareholders – especially Elias, the founder – that it was also placed on the stock certificate itself so that the "bearer" would know about it.

16.   Athena, the President of Sea Trade, entrusted Peters with two broad powers of attorney ("POA"), which were signed by her, as President, and executed on August 18, 1992. Athena granted Peters the POA "by order of the Board of Directors of [Sea Trade]" – as indicated on the POA itself.

17.   The POA appointed Peters – a recent law school graduate with a few years of maritime experience – as the attorney-in-fact of Sea Trade with the authority to manage the day-to-day operations of Sea Trade, including commercial management and everything having to do with running a shipping company.  Despite Coutsodontis's 45 years of maritime experience, neither Elias nor Athena appointed him as the attorney-in-fact of Sea Trade.

***Sea Trade's equity is restructured***

18.   In July 1994, Elias decided to give Peters an additional 25 shares of Sea Trade, while at the same time giving his sister, Anna, who was also Peters's mother, 150 shares.

19.   Elias died in September 1996.

20.   Following the death of Elias, his wife, Athena, became the owner of his 300 shares in Sea Trade.  The equity in Sea Trade was as follows:  Athena owned 300 shares of Sea Trade, Anna owned 150 shares and Peters owned 50 shares.

***Peters and Anna temporarily pledge their shares to Athena to secure emergency financing to repair Sea Trade's ship, the M/V Athena***

21.   After a 1997 bombing, the M/V Athena needed emergency repairs.

22.   In an effort to get a 1998 loan by the Bank of Maryland approved quickly, Peters

and his mother physically tendered their bearer shares to Athena so that Athena could correctly represent to the bank she was the sole owner of Sea Trade.

23.    In sum, because "time was of the essence" after the ship was bombed, the three shareholders "agreed that [Athena] would hold them temporarily."

24.    The three shareholders "felt that it would be much more expeditious and a much simpler transaction if there was just one owner rather than multiple owners" during the financing.

25.    Subsequently, the shares were physically returned to Peters and Anna and the status quo was restored.

26.    In 2002, when the M/V Athena was refinanced, there was a second transfer of shares "back and forth" between Peters, Anna and Athena.

27.    This transfer was done because the parties to the refinancing "wanted to be technical very correct."

***Athena dies and a handwritten paper purports to give Coutsodontis 250 shares of Sea Trade, the company he was restricted from joining***

28.    On January 13, 2003, Athena died in Greece.

29.    Upon Athena's death, a handwritten September 14, 2000 document purportedly left Coutsodontis with 250 shares of Sea Trade, and her sister, Anna, was left the remaining 50 shares, bringing Anna's total shares to 200.

***Anna files an action in Greece to declare the handwriting purportedly giving Coutsodontis 250 shares null and void***

30.     On January 11, 2005, Anna filed an action in Greece, before the Multi-Judge Court of First Instance of Athens, seeking to declare the handwriting purportedly giving Coutsodontis 250 shares null and void.  Coutsodontis filed a counterclaim asking the Greek courts to recognize

him as heir of Athena and owner of Athena's shares in Sea Trade (the "First Greek Action").  He did not ask the courts to recognize him as a Sea Trade shareholder, nor was he recognized as such.

***One month later, Coutsodontis publicly accuses Peters of Fraud and then later admits that the accusation was false***

31.    On February 9, 2005, one month after Anna filed the First Greek Action, Coutsodontis publicly filed an action, captioned *Coutsodontis v. Peters et al.* Index No. 600511/2005 in New York (the "New York Action" or "False Fraud Action"), in which he accused Peters of Fraud.

32.    Coutsodontis's public accusation was false as he later admitted that that was Peters did was not "fraud."

33.    Coutsodontis's motive was to harm Peters and Sea Trade.  Although he was claiming that he was a shareholder of Sea Trade, no court had yet recognized him as one when he publicly filed the False Fraud Action.

34.    When asked why he filed the False Fraud Action, Coutsodontis answered that he "did not know why" and that he "cannot answer that."

***Coutsodontis then accuses Peters of Forgery and admits that he had no basis for his accusation***

35.    In addition to falsely accusing Peters of Fraud, Coutsodontis also accused Peters of Forgery without any basis.  In the same New York Action, Coutsodontis filed an affidavit, in which he accused Peters of the felony crime of Forgery.  Specifically, he swore that:

> I am informed that in 1992, there is an allegation that Sea Trade executed a Power of Attorney which appointed defendant George Peters an Attorney-in-Fact for Sea Trade.  I have reviewed two different purported Powers of Attorney, each of which contains what I believe is an erroneous and forged signature of my sister.

36.    Coutsodontis confirmed in the next paragraph of the affidavit that it was Peters whom he was accusing of Forgery by claiming that Peters "appointed himself to manage the affairs of Sea Trade" ("False Forgery Allegation").

37.    Coutsodontis, however, admitted that he had not even reviewed Athena's signature on the POA when he accused Peters of forging Athena's signature.  Specifically, he testified that, in September 2008 – three years after he made the False Forgery Allegation – he still had not carefully examined Athena's signature on the POA.  This means that Coutsodontis accused Peters of Forgery before he actually reviewed Athena's signature.

38.    In addition, when Coutsodontis finally did "carefully review" the alleged forged signature on the POA, he did nothing to confirm whether the signature was actually forged.

39.    Coutsodontis did not hire a handwriting expert.

40.    He did not conduct an investigation.

41.    He did not bother to contact the Consul General of Liberia, Nick Soutos, who notarized Athena's signature on the POA, to confirm whether Mr. Soutos was present and witnessed Athena's signature.

42.    And even though he had known for years that Peters was the attorney-in-fact of Sea Trade, he never even told Athena, his sister, that her signature on the POA granting Peters responsibility for the day-to-day management of Sea Trade, was allegedly forged.

43.    Remarkably, Coutsodontis did not tell anybody at any time about this alleged Forgery, not even his own lawyers.

44.    These failures by Coutsodontis are further evidence that his False Forgery Accusation was nothing more than an attempt to harm both Peters and Sea Trade.

***After falsely accusing Peters of Fraud and Forgery, Coutsodontis follows Sea Trade's ship from port to port unlawfully arresting it***

45.     On July 31, 2008, Coutsodontis unlawfully arrested the M/V Athena, Sea Trade's ship, in Tarragona, Spain.  Coutsodontis knew that he had no maritime lien on the ship, but he arrested the ship anyway.

46.     Coutsodontis had heard the M/V Athena was being sold when he decided to unlawfully arrest the ship.

47.     Coutsodontis asked for a $10 - $15 million bond before he would agree to lift the arrest.

48.     As a member of the Society of Maritime Arbitrators with 60 years of maritime experience, Coutsodontis knew that his actions were unlawful.  He knew that a maritime arrest require an underlying maritime lien, a direct *in rem* claim against a vessel.  He also knew that a maritime lien attaches only to classical maritime activities, such as charters or vessel operations.

49.     On August 4, 2008, a Spanish court lifted the arrest and permitted the M/V Athena to once again engage in trade.

50.     In its decision, the Spanish Court held that "[…]it is the right to lift the arrest of the ship because the alleged issue exceeds…maritime claims."

51.     On February 19, 2009, an appellate court in Spain affirmed the August 4, 2008 decision to lift the arrest of the M/V Athena.

52.     The Spanish court did not rule on the merits of the case when it deemed the arrest of the M/V Athena unlawful and did not rule on any breach of fiduciary duty claim.

53.     After the Spanish arrest was lifted, Sea Trade was not immediately able to secure an alterative charter agreement.

54.     Sea Trade was only awarded compensatory damages, such as fuel costs, as a result of the wrongful arrest.

55.     On August 27, 2008, Coutsodontis once again arrested the vessel, this time in New Orleans, Louisiana.

56.     Coutsodontis did not advise the court in New Orleans that he had arrested the M/V Athena at its last port of call in Spain and that the Spanish court had determined the arrest wrongful and lifted the arrest.

57.     On September 12, 2008, the United States District Court for the Eastern District of Louisiana vacated the arrest.

58.     On September 16, 2008 the Louisiana district court issued an opinion, stating "[…] this dispute over an accounting is not a maritime claim and thus, is not subject to this court's admiralty jurisdiction."

59.     Coutsodontis appealed the Louisiana court's decision, and on June 18, 2009, the United States Court for the Fifth Circuit affirmed the decision.

60.     As a direct result of both unlawful arrests, Sea Trade suffered extensive monetary damages.

***Coutsodontis's bad faith is evidence when he admits that he did not care what happened to Sea Trade when he twice unlawfully arrested the M/V Athena***

61.     Coutsodontis arrested the ship after he had already filed one lawsuit and one counterclaim to determine whether he had an ownership interest in Sea Trade.

62.     Before any determination about his ownership interest in Sea Trade was made, Coutsodontis unlawfully arrested the ship – twice.

63.     Coutsodontis did not even bother to inform Peters that he was intending to arrest the M/V Athena in Spain.

64.    Coutsodontis arrested the M/V Athena "to protect his interest" even if the arrests "would cause Sea Trade to lose additional money" or "the company was going to be destroyed at the time."

65.    Coutsodontis intended – or at least knew – that the ship could be under arrest "for <u>years</u>."

66.    Coutsodontis admitted that he did not care if arresting the ship could damage the reputation of Sea Trade – all he cared about was "doing whatever [he could] to protect [his ] interests."

67.    Coutsodontis did not care whether Sea Trade lost millions of dollars in lost charters or market value.

68.    Coutsodontis knew that if a ship "cannot transport cargo, it cannot make money."

69.    In fact, Coutsodontis "did not care about anything else at the time except [his] interests."  He did not care if Sea trade would "lose additional monies."

70.    The ship "losing money" was no concern for Coutsodontis.

71.    When he arrested the ship, he "had nothing to lose."

72.    Coutsodontis "did whatever he had to do, and if it damaged Sea Trade, so be it."

73.    Coutsodontis did not care if he damaged the reputation of Sea Trade in the maritime community.

74.    Coutsodontis decided not to request that the proceeds from a sale of the M/V Athena be put in escrow.  Instead, he chose to unlawfully arrest the ship and hinder her from conducting any business and losing millions of dollars in revenue.

75.    When arresting the ship in Louisiana, Coutsodontis "did not care about the Spanish Court's decision or that he was going to relitigate the same dispute in Louisiana."

76.     When Coutsodontis lost in district court in Louisiana, Coutsodontis did not care why he lost and did not ask his lawyers why they lost the case or why the arrest was unlawful. That is because it did not matter to him.  He was going to rearrest the ship at the next port.

77.     Coutsodontis did not rely on the advice of counsel when arresting the ship.  It was his decision and "his decision" alone to make unlawful arrests.

***Sea Trade had to seek an injunction to stop Coutsodontis from unlawfully arresting the M/V Athena***

78.     On September 26, 2008, Sea Trade sought an injunction in the United States District Court for the Southern District of New York prohibiting Coutsodontis from continuing to arrest the ship.

***Before the First Greek Action issued a decision on whether he inherited 250 shares in Sea Trade, Coutsodontis files a Second Greek Action about the exact same issue***

79.     In October 2008 – after unlawfully arresting the M/V Athena multiple times – Coutsodontis filed an action before the Multimember Court of First Instance of Piraeus concerning the exact same issues that were the subject of the First Greek Action – namely whether he inherited 250 shares of Sea Trade from Athena (the "Second Greek Decision" or the "Second Greek Action").

80.     Coutsodontis filed the Second Greek Action before the First Greek Action was decided.

81.     Coutsodontis's own lawyer, Scott R. Johnston, confirmed the identical nature of the two actions.  Specifically, he affirmed that "Coutsodontis filed a 'companion' action before the Multi-Member Court of First Instance in Piraeus, Greece seeking recognition by Sea Trade of his alleged 50% stock ownership in Sea Trade together with an application….seeking

maintenance of the status quo of Sea Trade of his alleged 50% stock ownership in Sea Trade

pending a final determination of the counterclaim in the Athens court."

82.     On October 10, 2012, the Court in the Second Greek Action dismissed

Coutsodontis's claim, holding that "the lack of jurisdiction…was properly raised by Defendant

[Sea Trade and] should be accepted and [Coutsodontis's] lawsuit should be dismissed as

inadmissible."

83.     Accordingly, the First Greek Action and the Second Greek Action are inconsistent.

If the Court grants comity or res judicata effect to either action, it would be ignoring the decision

of the other action.

84.     The Second Greek Action involves the same parties as this action.  The First Greek

Action does not.

85.     Coutsodontis has never domesticated the First Greek Action.

***Sea Trade suffered extensive damages in both lost charters and in losing the opportunity to
sell the M/V Athena before the market plummeted***

86.     Coutsodontis considered that the market for ships could plummet after his

unlawful arrests.  However, he unlawfully arrested the M/V Athena twice anyway.

87.     Coutsodontis admitted that the market for ships "plummeted" after his unlawful

arrests of the M/V Athena.

88.     Based on the estimation of two different experts retained by the Parties, at the time

of the Spanish arrest, the fair market value of the M/V Athena was between $15 and 20 million.

89.     However, on or about January 6, 2009 – after the unlawful arrests – Sea Trade

entered into a Memorandum of Agreement for the sale of the M/V Athena for only

$2,625,000.00.

90.     On January 15, 2009, Coutsodontis applied to the Greek Courts for an injunction to

prevent the sale of the Athena.

91.     The Greek Court granted Coutsodontis's request for an injunction.

92.     On January 27, 2009, the parties entered into an agreement to allow the sale of the M/V Athena.

93.     Ultimately, the M/V Athena was sold for only $2,263,437.50.

94.     The monetary difference between the sale value of the M/V Athena before Coutsodontis had it wrongfully arrested in Spain in July 2008 and what the M/V Athena ultimately sold for in January 2009 was approximately $17.7 million.

95.      Sea Trade incurred approximately $3.5 million in loss of income based on lost charters while the M/V Athena was wrongfully arrested, including a lost charter from Interpec Iberica, S.A.

96.     Sea Trade incurred approximately $675,0000 in fuel and port costs during the arrests of the M/V Athena.

97.     Sea Trade incurred approximately $250,000 for the cost of the M/V Athena to wait at anchorage between the time the vessel's sale was first negotiated prior to Coutsodontis's anti-sale injunction and when it was actually sold.

98.     The total approximate damages are **$22,00,000**.

99.     If the Court determines that the diminution in sale price of the vessel is the mark of damages, the Court can alternatively find damages of approximately $360,000.00, which is the monetary difference in value between the negotiated sale price of the vessel prior to Coutsodontis's anti-sale injunction and the actual sale price of the vessel.

100.    Plaintiffs are also seeking punitive damages.

## CONCLUSIONS OF LAW

***Coutsodontis is liable for damages for Breach of Fiduciary Duty***

101.   Plaintiffs have asserted a claim for Breach of Fiduciary Duty.  The elements of a

Breach of Fiduciary Duty Claim are clear:  (1) the existence of a fiduciary duty; (2) conduct

breaching that duty; and (3) resulting damages.  *See Berman v. Sugo, LLC,* 580 F. Supp.2d 191,

204 (S.D.N.Y. 2008).  "[I]t is elemental that a fiduciary owes a duty of undivided and undiluted

loyalty to those whose interest the fiduciary is to protect.  This is a sensitive and 'inflexible' rule

of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in

which fiduciary's personal interest possibly conflicts of interest of those owed a fiduciary duty."

*Birnbaum v. Birnbaum,* 541 N.Y.S.2d 746, 748 (1989).

102.   There is no requirement that malice or bad faith be shown.   *See, e.g., S & K Sales

Co. v. Mike, Inc.,* 816 F.2d 843, 848 (2d Cir. 1987) ("the tort of participation in a fiduciary's

breach of duty does not require proof of intent of harm").

103.   A shareholder in a close corporation owes a fiduciary duty to the other

shareholders of that corporation.  *Brunetti v. Musallam,* 783 N.Y.S.2d 347, 349 (App. Div.

2000); *see also* Berman, 580 F. Supp.2d at 204.

104.   Coutsodontis's unlawful and improper arrests were breaches of his fiduciary duty.

*See, e.g., Innovative Networks, Inc. v. Young,* 987 F. Supp. 167, 183 (S.D.N.Y. 1997)( a fiduciary

must not act so as to cripple or injure the corporation and is answerable for damages the

company sustains because of that conduct, *aff'd* 152 F.3d 918 (2d. Cir. 1998); *In re Albion

Disposal, Inc.*, 152 B.R. 794, 823-24 (W.D.N.Y. 1993)(a fiduciary may not enter into a

transaction "of such nature as to cripple or injure the corporation"); *Wilf v. Halpern,* 599

N.Y.S.2d 579 (finding that actions by partners which expose the partnership to an unjustified risk

of financial harm constitutes a breach of the partners' fiduciary duties to their copartners");

*Gangeni v. Grancio*, 866 N.Y.S.2d 92 (Sup. Ct. 2008).  Coutsodontis ignored his personal legal

remedies and decided he did not want to wait for the First Greek Court to decide the issue of his

share ownership in Sea Trade.  Instead, he engaged in self-help and unlawfully arrested the ship

twice, which caused both the company and the shareholders harm and ultimately financially

devastated Sea Trade and its reputation.  Sea Trade also suffered irreparable harm.  Accordingly,

the arrests are actionable breaches of Defendant's fiduciary duty even without malice, bad faith

or gross negligence.  *See Berman,* 580 F. Supp.2d at 204; *S & K Sales Co*., 816 F.2d at 849.

      105.   Coutsodontis knew that his unlawful arrests would cost Sea Trade millions of

dollars in revenue from charters.  Coutsodontis knew that the market price of the ship could

"plummet" during the arrests.  Coutsodontis admitted that he did not care about anything except

"his own interests."  He admitted that if a ship "cannot transport cargo, it cannot make money"

and that was precisely the result of the unlawful arrests.  Coutsodontis "did whatever had had to

do, and if it damaged Sea Trade, so be it."  And he unlawfully arrested the ship because he "had

nothing to lose."  His admitting this alone is sufficient for a finding that he breached his fiduciary

duty.  *See, e.g., Stone ex. rel. Amsouth Bancorporation v. Ritter,* 911 A.2d 362, 369 (Del. 2006).

Further, it is ipso facto a breach of fiduciary duty to undertake an action that can only result in

damages to corporation, even if it to protect a shareholder's own interest.  *See e.g., Innovative*

*Networks,* 978 F. Supp. at 183 (a fiduciary may not enter into a transaction "of such a nature as

to cripple or injure the corporation"); *Wilf v. Halpern,* 599 N.Y.S.2d 579 (App. Div.

1993)(finding that actions by partners which expose partnership to an unjustified risk of financial

harm constitutes a breach of the partners' fiduciary duties to the copartners).  One court has

identified examples of conduct satisfying a breach of fiduciary duty claim to include:

> [W]here the fiduciary intentionally acts with a purpose other than that of advancing the
> best interests of the corporation, where the fiduciary acts with the intent to violate
> applicable positive law, or where the fiduciary intentionally fails to act in the face of a
> known duty to act, demonstrating a conscious disregard for his duties.

*Stone ex.rel.,* 911 A.2d at 369.

106.  Here, Coutsodontis's repeated arrests of the ship more than satisfy this standard.

When he rearrested the ship in Louisiana without even caring why he lost in Spain or asking his

lawyers why he lost he acted "with intent to violate applicable positive law."  His justification

for doing so – namely "to protect his interests" – is not justified.  This is no different than when

two partners jointly own a taxi cab and a profit dispute, and rather than seeking relief through the

courts, the complaining partner "arrests" the cab and stops all future income.

### Even if malice is required, Coutsodontis still breached his fiduciary duty

107.  Yet, even if Coutsodontis's state of mind was considered, the Court may find that

he acted in bad faith as a matter of law.  Before he even embarked on his unlawful arrest

campaign, Coutsodontis had already began his scorched-earth litigation by filing false Forgery

and Fraud Allegations against Coutsodontis, which he admitted were false and for which he had

no basis.  Then he unlawfully arrested the ship not once, but <u>twice</u>, and would have continued to

do so had it not been for Sea Trade filing an injunction against him to stop the repeated arrests.

*See, e.g., Coastal Barge Corp. v. M/V Maritime Prosperity*, 901 F. Supp. 325, 329 (M.D. Fla.

1994)(finding bad faith where the arresting party "knew full well of the ship's right not to be

rearrested by it" and where it failed to tell the Court of such a right); *Pace Shipping Services*

*Network SA v. M/V Ocean D,* 2003 WL 2175007, at *3 (E.D. La. July 21, 2003), *aff'd* 96 F.

App'x 957 (5th Cir. 2004))(declaring an arrest "wrongful" because the court had previously

found that plaintiff did not have a valid maritime lien on the vessel under the same theory).  He did not even bother to inform the Louisiana court about his previous unlawful arrest.  *See, e.g., Del Mar Seafoods, Inc. v. Cohen,* 2008 WL 2491703, at *6 (N.D. Cal June 19, 2008)(finding wrongful arrest where false and misleading statements were made to the court to seize the vessel).  He also failed to tell the Court that he had yet to be judicially recognized as a shareholder.  He then asked for a $10 - $15 million bond before he would agree to lift the arrest.  The ultimate goal was to economically coerce Peters into surrendering to Coutsodontis's demands or to destroy Sea Trade and attempting to do so.  His bad faith and malice could not be more evident.

### *Forfeiture of shares in a company is a recognized remedy for Breach of Fiduciary Duty*

108.   An equitable remedy is most appropriate where, as here, a shareholder has gone out of his way to destroy the very company he claims to own.  Monetary damages, alone, may not be enough as Coutsodontis will likely avoid paying them since all of his assets are hidden abroad.  "The court has sufficient power to impose such equitable remedy as may be appropriate.  Were the court to conclude that the facts alleged are proven and that equitable relief was called for, it could, for example require defendant…to divest the…stock it has now acquired." *Blommer Chocolate Co. v. Blommer* 1992 WL 245969, at *7, n. 2 (Del. Ch. Sept. 28, 1992); *see also Sly v. Abbott,* 264 P. 507 (Cal. Ct. App. 1928) (finding a partner was forced to forfeit his shares in the partnership based upon damages caused to partnership).  Coutsodontis's brazen self-help remedy – which ultimately destroyed the company and forced a sale of the M/V Athena at one-tenth of its value – should require forfeiture of his shares.

### *Coutsodontis does not satisfy the standard for a advice of counsel defense*

109.   Since Coutsodontis's intent or state of mind is irrelevant on the breach of fiduciary duty claim, advice of counsel does not provide a defense.  *See, e.g., Rispler v. Sol Spitz Co., Inc.,* 2007 WL 1926531, at *3 (E.D.N.Y. June 6, 2007); *Matter of Rothko's Estate,* 401 N.Y.S.2d 449, 455 (1977).  The advice of counsel defense is only relevant in considering whether an individual acted with the requisite intent in performing an act.  *See, e.g., Jock v. Ransom,* 2007 WL 1879717 at *9 (N.D.N.Y. June 28, 2007).

110.   To establish a viable advice of counsel defense, Coutsodontis must establish that he "(1) made a complete disclosure, (2) sought the advice as to the appropriateness of the challenged conduct, (3) received advice that the conduct was appropriate, and (4) relied on that advice in good faith."  *See, e.g., S.E.C v. Caserta,* 75 F.Supp.2d 79, 95 (E.D.N.Y. 1999)(emphasis added).

111.   Coutsodontis never submitted an affidavit or any communication between himself and his lawyers discussing the ramifications of the advice or any analysis of it.  Furthermore, there is no evidence that he "received" any detailed advice except his conclusory, self-serving statement that he relied on counsel.   In fact, he admitted that he did not care why he lost the Spanish and Louisiana arrests and did not bother to ask his lawyers why he lost both cases.

112.   Even if Coutsodontis could establish the first few elements, his reliance in "good faith" fails as a matter of law.  Coutsodontis arrested the ship twice, not just once.  He failed to inform the Louisiana Court about his unlawful Spanish arrest.  Coutsodontis's plan was to keep arresting the ship at every port it entered, with or without any basis.  Coutsodontis wanted to keep the ship under arrest "for years", as he admitted in his affidavit, even if it cost Sea Trade millions of dollars in damages.  Ultimately, Sea Trade had to commence a separate proceeding in federal court in New York to enjoin Coutsodontis from continually arresting the ship.  *Sea Trade*

*v. Coutsodontis,* 08-cv-08299 (S.D.N.Y. 2008).  The Court ultimately dismissed the case as moot

when the ship was sold.  On this undisputed record, Coutsodontis cannot establish good faith as a

matter of law.

***The Court should not give comity to the First Greek Decision since there is an inconsistent Second Greek Decision***

113.    There is a required procedure before a United States court enforces a foreign

judgment.  *See, e.g., Jennings v. Stephens,* 135 S. Ct. 793, 795 (2015)("Parties seeking to enforce

a foreign court's decree…domesticate a judgment.").

114.    Despite the fact the Greek Decision was issued almost a year and one half ago,

Coutsodontis did not bother to domesticate it.

115.    Given how much Coutsodontis cites and relies on it, this failure is inexcusable, but

not surprising, since he knows that Peters would have multiple bases for challenging it.

Coutsodontis would rather dwell in a grey zone, in which he can cite the decision in the First

Greek Action, but not have to deal with the myriad of problems it raises.

116.    Without domestication, there is no obligation for a United States Court to

recognize it as law or enforce it.

117.    Coutsodontis failed to domesticate the First Greek Judgment, depriving Peters of

the due process right to challenge it under United States Law.

118.    Consequently, the Court should not recognize or enforce it.

119.    The Court also should not give any comity to the decision.  To grant comity, courts

examine (1) whether the judgment was rendered via fraud; (2) whether the judgment was

rendered by a competent court utilizing proceedings consistent with civilized jurisprudence; and

(3) whether the foreign judgment is repugnant to fundamental United States principles of what is

decent and just.  *Aerotal, Ltd. v. IDT Corp.,* 486 F. Supp.2d 277, 283 (S.D.N.Y. 2007).  "[W]hen

the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, comity should be extended with less hesitation, there being few concerns over the procedural safeguards employed in those foreign proceedings."  *In re Bd. of Directors of Hopewell Int'l Ins. Ltd., Inc.,* 238 B.R. 25, 66 (Bankr. S.D.N.Y. 1999), *aff'd,* 275 B.R. 699 (Bankr. S.D.N.Y. 2002); *see also In re Metcalfe & Mansfield Alternative Investments,* 421 B.R. 685, 698 (Bankr. S.D.N.Y. 2010)(Canadian courts afford creditors a full and fair opportunity to be heard in a manner consistent with standards of U.S. Due Process).  The United States will recognize foreign judgments provided the proceedings are "orderly, fair and consistent with United States policy." *Murray v. British Broad Corp.,* 906 F. Supp. 858, 865 (S.D.N.Y. 1995), *aff'd,* 81 F.3d 287 (2d. Cir. 1996).  The First Greek Decision fails this standard.

120.   The First Greek Action violates the "procedural safeguards" of the United States since <u>there is an inconsistent Greek decision on the exact same issue</u> – namely Coutsodontis's alleged right to 250 shares of Sea Trade.  This makes the application of "res judicata" impossible because the Court would have to choose which Green Decision it would give comity.

121.   Giving comity to the First Greek Decision would violate public policy of the United States courts, which only may give res judicata, or claim preclusion, to a case if it involves re-litigation of the same claim by the <u>same parties</u> and by those in privity with the parties.  *Greenberg v. Bd. Of Governors of Fed. Reserve Sys.,* 968 F.2d 164, 168 (2d Cir. 1992)(emphasis added); *see also Office of Prof'l Employees Int'l Union, AFL-CIO v. Sea-Land Serv., Inc.,* 210 F.3d 117, 125 (2d. Cir. 2000) ("It is difficult to conceive how res judicata would apply since two proceedings involved both different parties and different issues").  Res Judicata – especially if it involves a foreign judgment – does not apply to a "later action between parties

or to a later action between the same parties on a different claim or demand." *Haring v. Prosise,* 462 U.S. 306, 315 (1983).

122.    The parties in the Second Greek Action and this action are <u>identical</u>. Consequently, if the Court had to make a choice to give res judicata effect to any decision, it should be the Second Greek Decision, not the First one.

Dated:  December 14, 2015
          New York, New York

                              **BEYS LISTON MOBARGHA & BERLAND LLP**

                              By:  _____/s/_____
                                        Nader Mobargha, Esq.

                              825 Third Avenue, 2nd Floor
                              New York, New York 10022
                              Telephone: (646) 755-3603
                              Facsimile: (646) 755-5229
                              Email: nmobargha@blmblaw.com

                              *Attorneys for Plaintiffs*